98 OCT 29 PM 12: 14

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MELINDA BARROW,

        Plaintiff,

vs.                        CASE NO. 96-689-CIV-ORL-19B

BRISTOL-MYERS SQUIBB CO.
and MEDICAL ENGINEERING CORP.

        Defendants.

---

## ORDER

### I. STATEMENT OF THE PROCEEDINGS

Plaintiff, Melinda Barrow ("Barrow") originally filed suit on May 27, 1994 in the United States District Court in the Eastern District of New York against Defendants Bristol-Myers Squibb Company ("BMS") and Medical Engineering Corporation ("MEC"). The case was transferred and docketed in this Court in June of 1996. Plaintiff alleged theories of strict liability, negligence, fraud, failure to warn, breach of warranties, negligence per se, misrepresentation, common plan to prevent public awareness of breast implant hazards, corporate joint venture liability, control and/or supervision of joint ventures, invalidity of indemnification agreements, alter ego liability, and punitive damages with reference to the bilateral implant of silicone gel breast prostheses that she received on November 21, 1985, at the age of eighteen. The two breast implants were designed, manufactured, and

1

marketed by MEC under the name of "Surgitek". They were surgically removed at Plaintiff's request on April 7, 1994. Plaintiff claims that her silicone breast implants caused her to suffer autoimmune and neurological disease, as well as local injuries, due to her exposure to silicone, silica, and other chemicals and by-products through the bleeding of low molecular weight silicone gel through the silicone elastomer shell of the implant. Defendants denied Plaintiff's claims, asserting, *inter alia*, that the implants were not defective, that they did not cause any of the health problems of which Plaintiff complains, and further that the implants were accompanied by a package insert when sold to the implanting plastic surgeon, Dr. John Graham Penn, who while acting as a learned intermediary gave Plaintiff information about the surgery and obtained her consent before the implant procedure was performed.[1]

Barrow is a citizen-resident of the State of Florida. Defendants BMS and MEC are citizens of the state of Delaware with their principal places of business located in New York and Wisconsin, respectively. The case was brought pursuant to the Court's diversity jurisdiction. The case was tried to the Court sitting as jury from November 10, 1997 to December 10, 1997 pursuant to waiver of jury trial entered by all parties.[2]

---

[1] Pretrial Statement pursuant to Local Rule 3.06(c), Docket No. 131, filed on October 20, 1997.

[2] Doc. Nos. 164 & 174 (filed November 3, 1997, and November 4, 1997, respectively).

2

During the course of the trial, Plaintiff discontinued her claims against BMS with prejudice, which action was subsequently reduced to writing as a stipulation between these two parties.[3]

## II. FINDINGS OF FACT

### A. THE PLAINTIFF

Melinda Barrow was born on February 16, 1967. She was described by her mother, Mollie Barrow, as a happy, healthy, very loving child who had many friends and a relatively uneventful, normal development as a child and adolescent. During her childhood, she skipped many of the usual childhood diseases such as mumps, chicken pox, and measles, and she did not have allergies or regular infections or fatigue. She had the normal developmental milestones for a child, had the usual vaccinations administered by her pediatricians, and had a good appetite resulting in her weight being appropriate to her physique as she developed. Mrs. Barrow described her daughter during this time as self-confident, active, and energetic, a person who enjoyed family and friends, and a good, average student who made mostly "B's" and some "C's" after she began attending Deland High School in the tenth grade.

In high school Melinda Barrow pursued a dream of becoming a model. She undertook modeling assignments and had

---

[3] Joint Motion by Plaintiff and Defendant (Stipulation), Doc. No. 268, filed December 22, 1997, endorsed as approved by the Court on December 31, 1997.

professional photographs taken to build her portfolio.[4]   Her
mother described her as being very diligent at her modeling
jobs.   At age sixteen, she was chosen to be featured on the
cover of <u>Central Florida Magazine</u>.[5]

In the eleventh grade, when Plaintiff realized that she
needed only three credits to graduate, she enrolled in a local
community college over the summer and obtained her high school
diploma in August of 1984.[6]   At this point, having previously
signed a modeling contract with Cassandra Carrigan's modeling
agency in Orlando, Florida, Melinda Barrow was ready to pursue
an international modeling career.

In January of 1985 Plaintiff, who was then only seventeen
years old, flew to Paris alone for several months to work as
a model.   She returned home to Deland, Florida in April for a
short visit and then traveled back to Paris for two months
before returning again to the United States to model in
Orlando and Atlanta over the summer and fall of that year.[7]
While in Paris, Plaintiff wrote to her mother about having
breast implant surgery because she felt it would enhance her

---

[4] <u>E.g.</u>, Plaintiff's Exhibits 1.1(a), (d), & (g-j).

[5] Plaintiff's Exhibit 1.1(b).   Plaintiff's mother
testified that at this time, her daughter was 5'9" tall and
weighed 115 pounds.

[6] Plaintiff's Exhibit 1.1(c) is a photograph of Plaintiff
during this period of time when her mother stated that the
normal weight of her daughter was generally between 115 and
120 pounds and did not fluctuate much.

[7] <u>See, e.g.</u>, Plaintiff's Exhibits 1.1(e) & 7.

4

career opportunities.[8]

In the fall of 1985, Melinda Barrow and her mother consulted with Dr. John Graham Penn, a plastic surgeon located in Winter Park, Florida, concerning the implant operation. Much of the testimony of Dr. Penn, Plaintiff, and Mrs. Barrow is consistent as to what occurred at this meeting. Mollie Barrow stated that Dr. Penn showed them a silicone gel breast implant by putting it on the table and stated that the procedure was relatively simple, that one could expect there would be no complications, and that it consisted of inserting the implant through a small incision below the breast which would leave a minimal scar. Mrs. Barrow testified that while she did not remember the exact words used by Dr. Penn, he gave no indication that there was any danger and left her with the impression that the implants were safe and should last a long, long time.[9]

Melinda Barrow also described the first meeting she had with Dr. Penn and her mother. She recalls that Dr. Penn said, *inter alia*, that silicone gel breast implants were safe, and he said either that they would last a long time or that they would last a lifetime.[10]  He also said that if the implant

---

[8] Defendant's Exhibits 1214 (a) & (b).

[9] Mrs. Barrow related that at the time she had great confidence in doctors and did not think Dr. Penn would tell her daughter to do something that was ill-advised.

[10] Whatever words Dr. Penn used, Plaintiff stated that he gave the impression that the implants would last a very long time.

5

ruptured and the gel were released, it would not be harmful to her. Plaintiff signed a consent form which contained a list of complications and warnings about the breast implants and implant surgery.[11] Plaintiff admits that she knew some of the

---

[11] Plaintiff's Exhibit 1.96(a). This document states in part:

The following points, among others, have been specifically made clear:

a.  The operation has been done for several years, but the end results are not, and cannot be determined for a number of years yet to come.

b.  Research indicates that the material implanted in the body does not cause malignancy in human subjects.

c.  There is a possibility that my body may not tolerate these implants, making it necessary to remove the implants. This occurs in a small percentage of cases.

d.  A cyst may form in the area adjacent to the implants, causing fluid accumulation which may require drainage by needle or removal of the implants.

e.  The breasts can become firm (capsule formation and contraction). This condition can be permanent and can cause pain and discomfort.

f.  No guarantee has been given as to size and shape of the breasts. Good results are expected but not guaranteed.

g.  In some patients the margin of the implants can be felt.

h.  The incision will heal with a scar which will be permanent.

i.  Postoperative bleeding may occur around the implant requiring a second operation for its removal.

j.  After being exposed to cold temperatures (i.e. swimming in cold water), the breasts may feel cooler than surrounding body tissues.

k.  Pregnancy is not recommended for at least six (6) months after the surgery.

l.  Numbness or hypersensitivity of the nipple may be experienced following surgery.

m.  The procedure is subject to the same post-operative complications as other surgical procedures.

n.  The implant shell theoretically could be

6

complications of such surgery.[12] However, she testified Dr. Penn did not discuss with her the concept of gel bleed or the issue of any relationship of gel bleed to systemic immune disease. The consent form contains no reference to gel bleed.

Reviewing his records,[13] Dr. Penn stated he first saw Plaintiff on October 15, 1985. While he did not recall her mother, he stated that he examined Plaintiff,[14] gave her information, and discussed the breast implant procedure, including the anesthesia, technique of the operation, and possible complications.[15] As to the latter, Dr. Penn stated he discussed with Plaintiff the possibility of problems with

---

broken at some point in the life of the implant or during the duration it is implanted. The gel contained within is medical grade and the same as the shell design and would in all probability be confined to the space behind the breast where the implant was implanted. This should not cause any serious side-effect.

[12] Plaintiff testified that Dr. Penn described the possibility of hematoma and having an accident causing the elastomer to rupture and the gel to be released in which event, he stated, it would not be harmful or cause any side effects. Dr. Penn explained that the breasts may become cold, that Plaintiff should not become pregnant for six months, and that scar tissue may form around the implants for which he suggested that Plaintiff take Vitamin E and massage.

[13] Plaintiff's Exhibit 1.96.

[14] His photographs of Plaintiff prior to the surgery are Plaintiff's Exhibits 1.58(a-e).

[15] Dr. Penn wrote a summary of this discussion in his notes for Plaintiff's visit on October 15, 1985. Plaintiff's Exhibit 1.96.

7

wide scars from the implant procedure[16], infection and removal of the implants, bleeding of blood and the possibility of having to re-explore the area, hypersensitivity or a numbness sensation in the breasts, slow healing of wounds, discoloration, and contracture associated with the capsule formation around the implant causing distortion, firmness, discomfort, and pain.[17]  Plaintiff was also advised that she should not become pregnant for at least six months after surgery.  Dr. Penn stated that his procedure was to review the consent form with a patient, going over the items verbally, and that his nurse or secretary would also go over the form with the patient at the time the surgery was scheduled.[18]  Dr.

---

[16] From the testimony of Mollie Barrow, Plaintiff, and Dr. Penn, it appears this discussion of scars pertained to the scarring from the implant procedure.  It does not appear that scarring upon explant was discussed at this meeting of Plaintiff and her mother with Dr. Penn.  Mollie Barrow acknowledged that on the initial meeting, Dr. Penn told both her and her daughter that the implant was a relatively simple procedure, would result in a minimal scar from a small incision below the breast to insert the implant, and that no complications should be expected because the procedure was not complicated.

[17] Dr. Penn related that the capsule is a membrane of scar-like tissue which occurs in a foreign body reaction and forms a sheet of scar tissue over the breast implant.

[18] On cross-examination, Dr. Penn was questioned about each item on the consent form, and he testified that it was his procedure to go over each item with each patient. However, later in his cross-examination he stated that it was not his routine to explain that in thin patients the edge of the implant may be palpable, even though the consent form warns of such result.
Dr. Alan Shons, who testified as an expert plastic surgeon called by Defendant, stated that he had reviewed Dr. Penn's deposition and his records and, in his opinion, Dr. Penn's warnings to Plaintiff were adequate.  He dismissed Dr.

Penn does not believe that he deviated from this procedure with Plaintiff.

Dr. Penn, who had been engaged in private practice as a plastic and reconstructive surgeon since 1974, testified that he could not recall what he may have told Plaintiff about how long the implants would last. It was not routine for him to discuss with his patients the duration of the breast implants unless he was asked, and if asked, his routine was to say that the implants would last a considerable length of time. Further, although he testified that he did not know definitely how long the silicone breast implants would last because they had not been around for too many years, he stated that he thought that they would last for quite a long time and hoped that they would last for a lifetime.[19]

Dr. Penn testified that he probably did not discuss gel bleed with Plaintiff because there was not much knowledge about gel bleed at that time.[20] He noted that the package

---

Penn's failure to warn of gel bleed as being of no clinical significance. Dr. Shon's curriculum vitae is Defendant's Exhibit 1155.

[19] However, he emphatically stated on cross-examination that he did not tell Plaintiff her implants would last a lifetime.

[20] While testifying that he learned about silicone gel breast implants from a variety of sources such as medical literature and professional meetings and manufacturer's literature, including package inserts, Dr. Penn stated that he did not know when or how he learned about gel bleed. He stated that he either did not read or could not recall if he had read many of the articles in the medical literature he was shown. He testified that he learned of gel bleed in the latter half of the 1980s and began using lower gel bleed implants in 1987.

AO 72A
(Rev.8/82)

insert of the breast implant manufacturer did not reference

gel bleed.[21]

---

Dr. Penn stated that he believed that the gel bleed would be contained within the tissue capsule. Dr. Shons testified that he also began using the low bleed implants during this time period. Dr. Penn stated that he "probably" explained gel bleed to his patients after he learned about it. He said that he understood that the silicone gel was a medical grade type, a gel that had been developed and checked for safety, and that it was safe for implantation into the human body. When he began using lower gel bleed implants in 1987, this is what he explained to patients about gel bleed. However, despite Plaintiff's several visits to Dr. Penn subsequent to the surgery and until 1993, her complaints of physical problems, and her questions to Dr. Penn about whether the implants could cause these problems, Dr. Penn did not advise Plaintiff of gel bleed or of any of the issues concerning systemic injuries, other than capsular contracture and numbness in the breasts. Instead, he assured Plaintiff that her implants were "OK". By this time, MEC had manufactured a barrier breast implant called the SCL series (Strong Cohesive Low-bleed) which it sampled out to doctors in 1985 and made available for sale in 1986.

[21] The package insert accompanying Plaintiff's implants is Plaintiff's Exhibit 1.77. The package insert stated the following complications:
> Complications may include the risks associated with the medication and the surgical procedure as well as the patient's degree of intolerance to the surgical procedure.
> --Potential complications are those associated with the mammary reconstruction or tissue replacement in general.
> --Capsule contracture (i.e., heavy fibrous capsule formation), with accompanying firmness and discomfort in the breast, is the most frequently reported complication. This condition may require surgical correction. Closed capsulotomy (i.e., manual compression of the breast) may cause a rupture with potential gel extravasation.
> --Prothesis displacement.
> --Hypertrophic scarring and loss of/or diminished nipple sensation have been reported.
> --Inadequate tissue covering and/or the use of steroids may result in necrosis and extrusion of the implant.
> --Potential of shell rupture during surgery or even well after surgery (e.g., spontaneously caused by

AO 72A
(Rev.8/82)

Dr. Penn stated that in 1985 when he performed the implant procedure on Plaintiff, he thought that if a silicone gel breast implant ruptured, the gel would extrude and the scar tissue capsule around the implant would contain the gel. He also thought that the gel would be taken up by the surrounding breast tissue, which would form a foreign body reaction, but that there should be very little foreign body reaction to the gel because silicone is one of the most easily tolerated foreign materials in the body. He testified that in 1985 he knew very little about gel bleed or the possibility that systemic injuries might be caused by silicone gel breast implants.[22] Dr. Penn is certain he did not discuss systemic disease with Plaintiff because he was not aware of any possible relationship between the implants and such disease

---

unknown etiology or caused by external trauma--stress--forces). Ruptured implants, as well as all the gel contents, must be removed because of possible extravasation of the gel. If this phenomenon does not occur additional surgery may be required to remove the gel.
--Infection, though infrequent, requires immediate treatment, including but not limited to antibiotics, drainage, and possible implant removal. Wound culture is advisable. Cases of latent infections of unknown etiology have also been noted.
Plaintiff's Exhibit 1.77 at 7.
    Dr. Shons reviewed the package insert for Plaintiff's implants and confirmed that there is no mention of gel bleed.

[22] Dr. Penn testified that he does not understand the chemistry involved in gel bleed on more than a superficial basis. Later in the trial, Dr. Shons stated that possibly there was a time in which he and other plastic surgeons knew about silicone gel breast implants but did not also know about gel bleed and that he, personally, did not know about gel bleed before 1974.

11

then.

The implant procedure occurred on November 21, 1985 and lasted one hour during which Plaintiff was placed under local, intravenous anesthesia, Surgitek silicone breast implants were inserted bilaterally, and the areas were closed. Plaintiff was discharged from the outpatient facility the same day after recovery. The surgery was routine and without complications.

Subsequent to the implant surgery, Plaintiff's international modeling career expanded.[23] Between 1986 and 1990, she had modeling assignments in many foreign countries such as Germany, Italy, Spain, Japan, and France for many well-known fashion designers and was included in several advertisements.[24] During the same period, she began developing persistent and increasing allergies, stomach and sinus problems, regular sore throats, rashes and skin blotches, swollen lymph nodes, sneezing and coughing, and fatigue, pain, burning, and hardening in her breasts, which she had not regularly experienced previously. She also began losing

_____

[23] Plaintiff testified that she believes her career as a model would have continued to be successful without implant surgery. Plaintiff's photographs as a model had been published in Italian Vogue before the implant surgery. She stated, however, that in the 1980s, models were in greater demand if they had large breasts, and she felt she would be able to model bathing suits and make the clothes to be modeled fit better with breast implants.

[24] See, e.g., Plaintiff's Exhibits 1.2(b),(c),(e),(f),(h), 1.1(e), & (i). A list of dates and countries where Plaintiff modeled is given in Defendant's Exhibit 1076.

AO 72A
(Rev.8/82)

weight.[25]

Despite increasing physical problems, Plaintiff expressed to her mother that she did not want to rely solely on modeling as a career. Thus between 1990 and 1993, Plaintiff paid for flying lessons, in large part from her earnings as a model, with the goal of obtaining a commercial pilot's license and becoming an airline pilot. To this end, she enrolled in Nova University, also paying for the tuition with earnings from her modeling career, to obtain a college degree which she felt would make her more attractive to airline employers.[26] On April 2, 1992, Plaintiff obtained her commercial pilot's license.[27] Mrs. Barrow described, and Plaintiff confirmed, how during this time Plaintiff took flying lessons, attended college, participated in a 1992 beauty pageant, and continued to do some modeling, all while her health was declining and she suffered from constant fatigue.

Over this period, Plaintiff, often accompanied by her mother, went to many doctors for her many developing health problems. The testimony of several of these treating health

---

[25] Plaintiff submitted to the Multi-District Litigation Panel a list, dated December 27, 1994, of symptoms and health problems she has suffered. Defendant's Exhibit 1076. She testified to her best recollection when she first noticed these problems and if they persisted after the implant procedure.

[26] Plaintiff's transcript from Nova University is Defendant's Exhibit 1084(d). See also Plaintiff's Exhibit 1.117bb.

[27] Plaintiff's Exhibit 1.80(a).

13

care providers was presented during the trial.  For instance,
Dr. John Gaffney, who had known Plaintiff since she was three
years old and had treated her as a chiropractor from her
childhood through the present time, was qualified as an expert
in chiropractic holistic care and clinical nutrition.  He
testified that Ms. Barrow had been a healthy individual until
around 1988 when she began to have fairly constant problems
with her neck and back, neuromuscular skeletal infections, and
fatigue, and, as time went on, developed problems with her
immune system, diarrhea and digestive problems, and problems
holding her weight.[28]  Dr. Gaffney reviewed his records of
Plaintiff's visits to him for treatment from 1970 to the
present.[29]  From 1970 to 1984, he saw Plaintiff twenty-seven
times, or an average of two times per year, over a period of
fourteen years, including three adjustments for complaints
stemming from a car accident in California on December 10,
1984.  Although he saw Plaintiff in 1984, 1985, and 1987, it
was during an examination in August of 1990 that Plaintiff
first complained of multiple and considerable pain in her
back, head, neck, and other joints, which Dr. Gaffney felt was

---

[28] Dr. Gaffney's notes of his treatments of Plaintiff
contain references to her weight as follows: January, 1982 -
107 pounds; August, 1991 - 114 pounds; February, 1994 - 104
pounds; July, 1995 - 115 pounds; January, 1996 - 119 pounds;
and July, 1996 - 115 pounds.

[29] Plaintiff's Exhibit 1.94.

14

unusual for her.[30] These problems persisted with additional complaints, from 1990 to 1994, of weakness, circulation problems, patchy blue and white skin, discoloration in her legs, rashes, headaches, loss of weight, frequent sore throats, persistent immune system problems, ear, throat, sinus and urinary tract infections, back spasms, loss of concentration and memory, swelling, decreased range of motion in her extremities, neck and back pain and stiffness, diarrhea, joint pain, depression, menstrual cramps, PMS, and tenderness of her skin to light pressure and temperature.[31] Before a visit by Plaintiff on August 14, 1990, Dr. Gaffney stated that he found Plaintiff to be very healthy. By 1992, Dr. Gaffney testified, Plaintiff was a "pretty sick girl."

Some of the other physicians who treated Plaintiff testified that they found that she suffered from Irritable Bowel Syndrome.[32]

---

[30] Dr. Gaffney treated Plaintiff five times between 1985 and 1990.

[31] In 1995, Dr. Gaffney saw Plaintiff sixteen times for these problems, although he felt that she was improving. He also saw her five times in 1996 and thirteen times in 1997. Plaintiff filed her lawsuit in New York in 1994. Following Plaintiff's implant surgery, many of the complaints of physical problems about which Dr. Gaffney testified were echoed in the testimony of Dr. Udita Jahagirdar, a specialist in obstetrics and gynecology who treated Plaintiff from July 1, 1986 through October 31, 1996.

[32] Dr. Lyle Wadsworth, a Deland, Florida physician who is board certified in internal medicine and geriatrics and who has seen Plaintiff several times as a patient beginning on August 5, 1991, stated that he diagnosed Plaintiff as having Irritable Bowel Syndrome as early as August 5, 1991. Deposition of Wadsworth at 5-7.

On August 18, 1993, Melinda Barrow married Kyle Eric Furbee.[33] They moved to Lakeland, Florida where Dr. Furbee was building his practice as a chiropractor. However, Plaintiff's physical problems worsened after her marriage. Her husband testified, and Plaintiff and her mother confirmed, that within one week of their wedding, Plaintiff had to return to her parents' home in Deland so that her mother could take care of

---

Dr. David H. Lebioda, board certified in internal medicine and gastroenterology, saw Plaintiff on June 10, 1994 on referral from Dr. Jamie D. Carrizosa. From her symptoms related to gastroenterology, Dr. Lebioda felt that Plaintiff could have anything from a benign condition such as Irritable Bowel Syndrome to Crohn's disease or cancer of the colon. Deposition of Lebioda at 4, 9, 13, & 18. However, Plaintiff canceled the colonoscopy he had scheduled to rule out inflammatory bowel disease, and the closest diagnosis he could give was Irritable Bowel Syndrome. Id. at 36-39 & 45. Dr. Lebioda disclaimed any expertise in the area of silicone toxic syndrome. Id. at 36.

Dr. Patrick G. Brady, a board certified gastroenterologist, saw Plaintiff twice, once on October 6, 1994 and again on November 2, 1995. From tests, including a sigmoidoscopy, he determined that her blood and liver were normal and that her symptoms were most compatible with Irritable Bowel Syndrome accompanied by chronic anxiety and depression. Deposition of Brady at 5, 8-15, & 22. He, like Dr. Lebioda, recommended increase in her food intake and fiber content. On her second visit, he referred her to a specialist in eating disorders for psychiatric evaluation because of her chronic anxiety and depression and abdominal pain not symptomatic of malnutrition. Id. at 14-16. Dr. Brady was concerned about anorexia nervosa, although he did not give that diagnosis. Id. at 22. Dr. Brady testified that he did not treat eating disorders and was not well-versed in problems caused by silicone gel breast implants. Id. at 17 & 27-30. He reviewed the records of Dr. Ira Klein, a gastroenterologist who saw Plaintiff on referral from Dr. Andrew William Campbell, and testified that they reflected abnormal findings, such as mild gastritis, colitis, elevated protein, and others. Id. at 48-49.

[33] Photographs of Plaintiff's engagement and wedding are Plaintiff's Exhibits 1.2 (i) & (j). Plaintiff also modeled her wedding dress. Plaintiff's Exhibit 1.2(m).

her.  Dr. Furbee stated that for the first six months of their marriage, Plaintiff spent over fifty percent of her time with her parents because of her physical problems, which he described as stomach upsets, cramps when she ate, joint pains, and headaches.[34]

Subsequent to the 1985 implant procedure, and, according to Dr. Penn, by December 30, 1986, Plaintiff had significant capsular contracture in both breasts.  Plaintiff saw Dr. Penn at least once a year to treat the scar tissue which had formed around the implants, causing her breasts to become so hard that, she testified, at times she could not sleep on her stomach.  Dr. Penn recommended that his patients take fairly high doses of Vitamin E and gently massage around the implant to reduce the possibility of capsular contracture on the theory that moving the implant around as the capsule forms over it would tend to keep the implant's space as large as possible.[35]  Dr. Penn also performed a "squeeze," or a closed capsulotomy, a painful remedy which provided relief to Plaintiff for a time before the breasts became hardened again.[36]  Closed capsulotomies were performed on Plaintiff on

---

[34] Dr. Furbee stated that he knew that Plaintiff had breast implants before their marriage.

[35] In 1992 or 1993, Dr. Penn became aware that massage of the breasts might cause a change in the cohesiveness of the silicone gel in the implants.  Nevertheless, he continued to recommend to his patients, including Plaintiff, that they massage their breasts after the implant surgery.

[36] Closed capsulotomy is a technique used by physicians to attempt to break the scar tissue capsule around the implant

August 5, 1986, December 30, 1986, May 7, 1987, April 25, 1988, May 12, 1988, and January 6, 1992.[37]

However, one breast developed a bulge, causing Plaintiff to become concerned.[38] On her inquiry to Dr. Penn in 1991 and again in 1993, Plaintiff stated Dr. Penn informed her that there was no evidence of rupture, that the bulge in her breast was caused by the edge of the implant and weakening of the capsule, and that the only thing Dr. Penn could do for this condition was to remove the implants and insert new ones.[39]

---

during which the implant is held behind the breast and pressure is applied to the capsule to try to get it to release, or the physician squeezes over the capsule in an attempt to break the capsule tissue. Plaintiff gave written consents for these procedures. See Plaintiff's Exhibit 1.96 at 10622-27 & 10631. Dr. Penn testified that both capsular contracture and the closed capsulotomy procedure can be painful. Dr. Shons testified that Dr. Penn's treatment of Plaintiff in this regard with massage and the closed capsulotomy procedure was appropriate, although he admitted that he did not use the closed capsulotomy procedure in his practice because it was an uncontrolled procedure the objective of which was to create a defect in the fibrous capsule, and one could not control exactly where the defect would be.

[37] Plaintiff's Exhibit 1.96.

[38] Plaintiff's Exhibits 1.75(a), (d), & (r)(1-3). Plaintiff feared the bulge in her breast might be a cyst. A mammogram and MRI confirmed that the bulge was caused by the implant. Plaintiff's Exhibits 1.98 a & b. Dr. Wadsworth testified that on his physical examination of Plaintiff on August 5, 1991, he did not note a deformity of the breast. Deposition of Wadsworth at 28.

[39] Plaintiff's Exhibit 1.75a is a photograph taken in 1994. Dr. Penn's postoperative photographs of Plaintiff were not taken until 1993 and are Plaintiff's Exhibits 1.59(a-e). Dr. Penn last saw Plaintiff in 1993. He explained that the scar tissue capsule which forms around the implant is irregular and can be thicker in some places. The closed capsulotomy does not always cause the capsule to release and

When shown a picture of the bulge in Plaintiff's breast, Dr. Penn noticeably winced on the witness stand and stated that he did not expect a result like that to occur, nor had he warned Plaintiff that this might be a result of the implant procedure.[40]

---

can cause a bulge. Dr. Penn also stated that the bulge could be due to a weakness in the capsule. The parties dispute whether Plaintiff manipulated or pushed her breast to accentuate the bulge shown in the picture. However, Dr. Penn's notes reflect that on his examinations of Plaintiff on January 21, 1991, January 6, 1992, and May 29, 1992, he found an irregularity in Plaintiff's breast which felt like the edge of the implant. Dr. Penn's notes reflect that he found a slight irregularity on the medial aspect of one of the Plaintiff's breasts on one of her visits, but not to the degree reflected in the above referenced picture. In his office notes, Dr. Penn wrote that it appeared that the implant was protruding through a slight weakness in the capsule. He also testified that he found an irregularity in the medial aspect of both of Plaintiff's breasts caused because the capsule had not released when the closed capsulotomy was done so that there was more tightening in that area. In addition, both Plaintiff's husband and her mother confirmed that Plaintiff had a lump from the implant on the inside of one of her breasts. In March of 1994, Dr. Campbell took photographs of the folds apparent in Plaintiff's implants when she pushed up and stated that they resumed their shape when she released them. Further, Dr. Shons also testified that Plaintiff had a "slight deformity" in her right breast. To the extent that a factual issue is presented, the Court finds that Plaintiff had a bulge in her right breast caused by the implant.

[40] In 1993, Plaintiff was refused further coverage by her health insurer. Dr. Penn wrote a letter contained in her records dated March 17, 1993, which he testified reflected accurately his view that the lump in Plaintiff's breast was an irregularity and an aesthetic problem and that there was no clinical evidence of rupture or other problem with the implant. Plaintiff's Exhibit 1.96 at 10632; Defendant's Exhibit 1089A. Plaintiff sent the letter to the insurer along with her letter dated March 29, 1993, asking the insurer to reverse its action. The insurer responded by letter dated May 6, 1993 denying Plaintiff's request, noting that Plaintiff had failed to report Plaintiff's mammogram, the bulge in the right implant, the capsular contracture, and Dr. Penn's closed capsulotomies as treatments. Defendant's Exhibit 1089A.

19

However, Dr. Penn recommended against removal of the implants and, according to Plaintiff, stated that since her particular implants were then no longer being made, Plaintiff should wait to have her implants removed because something new would come on the market. At no time did Dr. Penn recommend removal of the implants. In 1993, after Plaintiff saw a television show on problems with breast implants, Plaintiff called Dr. Penn who advised her that he thought the implants were "OK" and were not the cause of her physical problems.

Plaintiff did not model after October of 1993. In 1994, Plaintiff's physical ailments became so severe that she dropped out of college and stopped taking flying lessons.[41] In March of that year, Plaintiff and her mother flew to Texas to see Dr. Andrew William Campbell after Plaintiff had obtained his name from a silicone breast implant support group

---

[41] Plaintiff testified that in 1994 she lost 25 pounds, had mucous coming out of her bowels, suffered from fatigue, had rashes on her breasts, had stomach problems, swollen lymph nodes, and sores in her mouth, had trouble breathing, developed broken vessels on her hands, and had other problems. Plaintiff presented photographs taken from January to April of 1994 reflecting her physical problems: mouth sores (Plaintiff's Exhibits 1.75(n), (cc), (i), & (j)); broken blood vessels (Plaintiff's Exhibit 1.75(h)); rashes (Plaintiff's Exhibits 1.75(o),(m), &(p)); bruising (Plaintiff's Exhibit 1.75(r-4)); and blotches on her legs (Plaintiff's Exhibits 1.75(y) & (z)). One of the most startling photographs is of rashes that are several inches wide and that extend from under each of Plaintiff's breasts to her abdomen. Plaintiff's Exhibits 1.75(k) & (l). This photograph appears faded unless viewed, as was utilized at trial, with an ELMO, a visual presenter video presentation unit.

in Tampa, Florida.[42]   Dr. Campbell performed tests, treated
Plaintiff, and referred her to Dr. Fabian Worthing III upon
her request to have an explant operation.[43]

---

[42] Dr. Campbell is board certified in family practice and
forensic medicine. His curriculum vitae is Plaintiff's Exhibit
1.87(g). Since 1985 he has specialized in immunotoxicology,
the study of how chemical toxins affect the body as a whole
and the immune system in particular.   The records of his
treatment of Plaintiff are Plaintiff's Exhibits 1.87(a) & (b).

[43] On his examination of Plaintiff in March of 1994, Dr.
Campbell stated that he found, among other things, objective
indications that Plaintiff had tiny red petechial dots
throughout her skin, hyperactive deep tendon reflexes, and
swollen lymph nodes in three areas.  She also had lesions on
her hands and fingers, weight loss, and muscle wasting.
During his testimony in reference to these conditions, Dr.
Campbell referred to photographs in Plaintiff's Exhibits 1.75
(h),(m),(o),(p),(q), & (r).  After receiving the results of
tests, it was Dr. Campbell's opinion that Plaintiff had
infection as well as immune system stimulation due to her
silicone gel breast implants. Dr. Campbell did a thermography
to test the temperature of her skin and found elevated
temperature indicating inflammation from the breasts through
the lymphatic channels, symptoms which he felt supported this
opinion.  Plaintiff's Exhibit 1.87(c). Dr. Campbell testified
that his tests revealed that Plaintiff had several different
antibodies, including antibodies to 15 different fungi, 3
different kinds of parasites, and silicone, an elevated
rheumatoid factor, and an actively stimulated immune system,
all of which he felt were related to her silicone gel breast
implants. He testified that her complaints of fatigue, stomach
problems, mucous in her stools, constant sores in her mouth,
sore tongue, weight loss, rashes, and tenderness in her
shoulders were also related to her silicone gel breast
implants.  He prescribed medication and a nutrition plan and
told her to avoid chemicals, chlorine, artificial coloring,
preservatives, sugars, and non-natural fibers.   Plaintiff
refused Dr. Campbell's recommendation that she receive six
weekly treatments per year of intravenous gamma globulin for
the rest of her life unless there was substantial improvement
in her condition or a cure.   These treatments would have
lasted four to six hours each, at a cost of $15,000 each year.
   The tests ordered by Dr. Campbell generated much
testimony during trial.   Dr. Jacques Caldwell, an expert
witness for Defendant in internal medicine, rheumatology,
immunology and allergies, was critical of both the tests and
conclusions of Dr. Campbell, noting that the vast majority of

21

tests that Dr. Campbell ordered had no medical indications suggesting the need for them, the number of tests ordered were excessive, and some of the tests were unusually expensive. For instance, Dr. Caldwell testified that Dr. Campbell's anti-fungal test was not a panel of tests used by anyone whom Dr. Caldwell knows, and the positive result just showed exposure to common fungi inhaled every day; it did not show a fungal blood infection. Dr. Brian Kotzin, an expert in immunology presented by Defendant, agreed. Dr. Lebioda testified that he was not sure this fungal test was valid because infections can leave positive antibodies, a result which does not mean the patient currently has infection, and further, he did not believe Plaintiff had bowel parasites when he examined her on June 10, 1994. Deposition of Lebioda at 40-45. Dr. Caldwell also scoffed at Dr. Campbell's thermogram, stating it showed nothing because it registered temperature from blood flow, and the blood circulating closer to the skin will appear a deeper red. Dr. Caldwell rejected the gamma globulin treatment Dr. Campbell had recommended as experimental, used to treat patients with life-threatening, drug-resistant immune diseases who have tried and been unsuccessfully treated with standard treatments, and outrageously expensive. He opined that Dr. Campbell's tests do not indicate any immune disorder in Plaintiff or show that she is hypersensitive to anything. Dr. Caldwell concluded that Plaintiff has no immune dysfunction whatsoever.

Dr. Kotzin was also critical of the number and types of tests ordered by Dr. Campbell, stating that they were not customary with a patient presenting Plaintiff's symptoms. Dr. Kotzin stated that it would be usual to order a blood chemistry, a white and red blood cell count, an urinalysis, the sedimentary ("SED") rate test, an antinuclear antibody ("ANA") test, and a rheumatoid factor test. However, he stated, in twenty years he had never ordered an anti-striated antibody test and that it is unclear what this test determines. Further, he noted that the antiparietal cell antibody test is for pernicious anemia because of stomach damage, and Plaintiff had no sign to warrant this test. Dr. Kotzin testified that the anti-smooth muscle antibody test is used to determine the cause of liver abnormality, not to determine if the patient has an abnormality of the liver, and it is not used often at present because other tests are much better. He noted that the rheumatoid factor test results presented by Dr. Campbell showed a positive result while other laboratory results were negative. Dr. Kotzin testified that rheumatoid arthritis could not be the diagnosis based on these results because people without rheumatoid arthritis can have a positive rheumatoid factor on this test. Dr. Kotzin noted five established criteria for rheumatoid arthritis: (1) objective swelling; (2) stiffness in the joints, not the

On April 7, 1994, Dr. Worthing removed Plaintiff's two implants which were intact and not ruptured.[44] Dr. Worthing testified that the pathology report from the explant was not unusual and reflected dense scar tissue with foreign body

---

muscles, on both sides of the body; (3) rheumatoid nodules or lumps under the skin; (4) hand arthritis; and (5) a positive rheumatoid factor test. Dr. Kotzin stated that a patient must have four or more of these criteria over six weeks to be diagnosed as having rheumatoid arthritis. He criticized Dr. Campbell for using criteria in his diagnosis which were not generally recognized and testified that nothing indicated Plaintiff has rheumatoid arthritis. Further, the deep tendon reflex test Dr. Campbell performed from which he found hyperreflexia, or that the reflexes were more active than normal, cannot be used to determine or diagnose peripheral demyelinating neuropathy or the myelin of the nerves breaking down according to Dr. Kotzin. Dr. Kotzin stated that there is no evidence that Plaintiff has demyelating neuropathy. Finally, Dr. Kotzin testified that there is no evidence Plaintiff has autoimmune disease, systemic inflammation, or systemic illness accounting for all of her complaints. Dr. Kotzin found her lab test results were mostly normal, and no test identified a specific illness. For instance, Irritable (or Functional) Bowel Syndrome, in which the patient has diarrhea and constipation, has no organic cause to identify or explain it, and people without silicone gel breast implants have it according to Dr. Kotzin.

Dr. Klein was also critical of the tests Dr. Campbell had run. He did his own blood tests and stated the results were normal. Deposition of Klein at 8-9 & 12-14. In particular, he found that Plaintiff was not anemic, her white cell count was not elevated, there was no evidence of infection, her SED rate was normal and excluded certain inflammatory, infectious disease, and that her chemistries were normal. He did a colonoscopy and ruled out Crohn's disease, Irritable Bowel Syndrome, and ulcerative colitis. Id. at 12-13 & 36-48. He testified that Dr. Campbell's laboratory work showed abnormal values which did not indicate a medical illness but instead indicated that the laboratory Campbell used did not know what it was doing. Id. at 56. In disagreeing with the results of the blood work done by Dr. Campbell, he stated that if Plaintiff had antibodies to almost every infectious disease known to man as shown in Dr. Campbell's laboratory results, she would be dead. Id. at 56 & 70.

[44] Deposition of Worthing at 18.

23

AO 72A
(Rev.8/82)

reaction and crystalline foreign material in the capsule.[45] Dr. Worthing noted that the crystalline foreign material referenced on the pathology report is found generally only in women with silicone gel breast implants.[46] While he tried to remove all the free silicone in the capsule, he was not able to testify that he had removed all of the silicone from this area of Plaintiff's breasts.[47] In the course of the explant, he removed some of the Plaintiff's interior breast tissue, and since Plaintiff is very thin, he testified, the cosmetic deformity resulting to Plaintiff from the explant operation is more pronounced.[48]

Mollie Barrow described her daughter in April of 1994 as being very sick, weighing below one hundred pounds, suffering from allergies, rashes on her chest, blotches on her legs, stomach upsets, and problems with her sinuses and her joints. She accompanied her daughter to Texas for the explant, and at trial she gave moving testimony about her daughter's condition after this operation. She stated that Plaintiff weighed ninety-two pounds, looked like a concentration camp survivor, and that Plaintiff felt that she was on her death bed. Plaintiff was extremely weak, depressed, and unable to care

---

[45] Id. at 22 et seq.

[46] Id. at 69.

[47] Id. at 64-65.

[48] Id. at 54-55 & 70.

24

for herself.[49]  For one month her mother changed her dressings, bathed her, washed and combed her hair, cut her food, and attended to her needs because she could not get up or care for herself.  Plaintiff expressed to her mother that she felt she had received a double mastectomy.

For several months after the explant procedure, Plaintiff continued to be very sick with bowel problems, severe stomach cramps, and little appetite.  Her husband echoed her mother's testimony that Plaintiff remained very sick; in fact he felt that for the first three months after the operation she became worse.[50]  She was very thin and weak with no strength, her skin was a grey color, and he feared that she would die from emaciation.

Subsequent to the explant, Dr. Sandra Houston[51] also described her efforts to provide psychological treatment to

---

[49] When Plaintiff arrived home with her mother, her husband tried to help change her dressings in her parents' home.  Kyle Furbee stated that he tried to hide how upsetting his wife's condition was but he was not successful.  Mollie Barrow heard her daughter scream from her bedroom.  When she ran to this room, she found Dr. Furbee with her distraught daughter crying over her husband's reaction to her condition.  Plaintiff presented photographs of her condition at this time.  Plaintiff's Exhibits 1.61 (a) & (c).

[50] Dr. Campbell testified that it is not unusual for symptoms of silicone gel breast implant patients to become worse immediately after explant because the silicone gel is stimulated and more of it gets into the blood stream during the explant surgery.

[51] Dr. Houston is a clinical psychologist who treated Plaintiff in four sessions beginning in June of 1992 and who treated her again beginning on October 12, 1994 after the explant operation.

25

help Plaintiff overcome her depression.[52] Dr. Houston noted
that Plaintiff's depression was not only from the disease
process, but also was from the threefold loss of her career,
her goals, and her body image as being that of a physically
attractive person.[53] After identifying the etiology for her
depression as being a disease from silicone poisoning, Dr.
Houston tried to get Plaintiff to take small steps to feel
cognitively better about herself based on what Dr. Houston
thought was feasible for Plaintiff to accomplish.[54] Dr. Houston

---

[52] Dr. Houston testified that she was shocked by
Plaintiff's appearance and would not have recognized her when
she returned for psychological treatment after the intervening
two years and after the explant. Not only had Plaintiff's
physical appearance drastically changed, but also Dr. Houston
described Plaintiff's lack of energy, optimism, independent
spirit, and motivation, all of which had been present during
their interaction in 1992. Instead, in her treatment of
Plaintiff beginning in 1994, Dr. Houston found Plaintiff to be
a fearful, dependent, introverted personality with few friends
and no life goals. Dr. Houston's records of her treatment of
Plaintiff are Plaintiff's Exhibit 1.97.

[53] Dr. Houston testified to manifestations of this
depression, *inter alia*, that Plaintiff was embarrassed by the
way she looked, that her clothes no longer fit, that she had
no desire for normal and healthy sexual and physical intimacy
both because it was painful and because of the scars on her
breasts, that although she was a very spiritual person, she
resisted going to church because people stared and felt she
had a contagious disease or AIDS, and that she was fatigued,
had poor circulation, could not stand for long, and cried
often.

[54] In this regard, Dr. Houston recommended such things as
massage as a way for Plaintiff to get in touch with and accept
her changed physique, taking walks to the store to build up
strength, going out to eat or to the movies, spending time
with her husband's parents as well as with her own, taking art
and creative classes, participating with her husband in
building a new home, wearing padded bras, and giving away
outfits to let go of her past image and negative reminders.

26

AO 72A
(Rev.8/82)

testified that Plaintiff's depression was disabling, was secondary to her disease, and that her prognosis for Plaintiff in the future was poor.[55] Although Dr. Houston has seen small improvements in Plaintiff, she does not believe that Plaintiff will return to her pre-morbid condition or that there will be any marked change with her underlying medical condition. Dr. Houston testified that Plaintiff will need therapy for the rest of her life.

Since the explant, Plaintiff has been to many doctors in her quest to improve her health.[56] Her husband described her improvement as a slow and gradual process, stating that since the end of 1995, she has continued to be thin, but not deathly so. Plaintiff continues to get mouth sores, rashes on and numbness in her breasts, broken blood vessels and bruises in her hands, itchy rashes, blotches and coldness in her legs and ankles, and urinary tract and ear infections; and she also

---

[55] Dr. Houston elaborated that Plaintiff was in tremendous distress, vacillating between moderate and severe depression, that Plaintiff was honest, not malingering, and, if anything, Plaintiff would "fake" things as being good, presenting a positive image if she could. Dr. Houston found that Plaintiff had a number of physical complaints, above average intelligence, and not a great deal of "ego strength".

[56] For instance, Plaintiff has seen Dr. Ira Klein and Dr. Andrew D. Campbell in Houston, Texas; Dr. David Lebioda, Dr. Frank Vasey, Dr. Laurie Barclay and Dr. Patrick Brady in Tampa, Florida; Dr. Bower (rheumatologist) in New Jersey; and Dr. Lyle Wadsworth (internal medicine) and Dr. John Gaffney (chiropractor) in Deland, Florida. She has also seen Dr. Sandra Houston, Dr. Tomas Bocanegra, Dr. Udita Jahagirdar, Dr. H.G. Robinson, Dr. White, and Dr. Jamie D. Carrizosa.

27

suffers from fatigue, headaches, and constipation.[57]  She still
suffers pain in her back and in the muscles behind where the
implants had been located.  However, these problems do not

_____

[57] Dr. Campbell confirmed these symptoms, stating that
when he saw Plaintiff in September of 1997, she complained of
being very tired, having poor energy, mucous in her throat,
yellow stools, sinus problems and headaches, poor appetite,
earaches, tender breasts, lesions on her legs, inflammation of
her hair follicles, and of being prone to infections.  She was
pale and thin in appearance and had livedo reticularis or
lacy, motley coloration of the skin, indicating a problem with
the blood vessels and circulation, and a tendency to bruise
and bleed easily. Dr. Campbell noted rashes on Plaintiff's
legs, face, breasts, and abdomen. He felt the cause of these
problems was the effect of silicone on her immune system
which, due to silicone stimulation, prevented her from
handling body processes as a normal, healthy person would.
Dr. Wadsworth also testified to the symptoms which Plaintiff
reported and which he observed in his treatment of her since
August 5, 1991.
     Dr. Kotzin stated that Plaintiff did not exactly have
signs of livedo reticularis, a vascular rash seen on the arms,
legs, and torsos of normal people due to spasm, inflammation,
or change of blood vessels, although he acknowledged that he
had seen reference to this in the records of some but not all
of her doctors, particularly Dr. Vasey.  Dr. Kotzin noted that
this can be a sign of poly-arthritis and in severe cases is
present constantly instead of coming and going, as occurs in
normal patients.   In severe cases it can be related to the
pathology of a disease until it is treated or goes into
remission.   It is a blotchy rash which is seen in normal
individuals who do not have defined connective tissue disorder
("CTD"), and it comes and goes in persons who are pathologic.
Dr. Kotzin felt that Plaintiff's livedo rash was not noted as
being constant.   He admitted seeing laboratory results showing
elevated IGM, rheumatoid factor, and elevated immune complexes
on Plaintiff.   Further he opined that Plaintiff suffers from
depression which can cause physical symptoms like fatigue,
malaise, and myalgia.   He testified that he had seen women
with Plaintiff's symptoms in his practice, and a significant
percentage, although not all, have depression whether they
have breast implants or not.  Often the depression makes the
symptoms worse, but it is possible that the symptoms make the
depression worse.   Plaintiff's telangiectasis, or discrete
dilated blood vessels, is seen in women without breast
implants and without defined connective tissue disorder
according to Dr. Kotzin.

AO 72A
(Rev.8/82)

occur as frequently since the explant was performed. Plaintiff continues to suffer from very sharp pains in her breasts, and her breasts are permanently scarred from the explant.[58]

Dr. Campbell testified that while Plaintiff is not a malingerer and wants very much to get well, he did not see significant improvement in her condition between 1994 and 1997 when he treated her. In the opinion of Dr. Campbell, Plaintiff will not be able to work as she is weak and prone to chronic infections. Dr. Houston concurred.

Presently, to help alleviate her physical problems, Plaintiff and her husband endeavor to use only natural foods and products. They watch for artificial preservatives or coloring in food, avoid refined sugars, and do not use detergents and cleaners, all of which cause Plaintiff to have nausea, fatigue, headaches, and rashes. Plaintiff further wears clothing made of natural fibers.

Two years ago, Plaintiff and her husband bought a house in Lakeland, Florida, and within the last year, Plaintiff has spent about half of her time there with her husband and half of her time in Deland with her mother. Her husband testified that she continues to improve. She has more energy, is able to help more around the house, and seems happier now.

---

[58] Plaintiff's Exhibit 1.60(a), (b), & (c). Dr. Worthing testified that he last saw Plaintiff on December 4, 1995 and told her that he could not make the scars on her breasts look better. Deposition of Worthing at 9 & 45.

However, Mrs. Barrow testified that her daughter's personality has remained changed; she now has few friends, has little energy, and finds it difficult to be in large groups.

Plaintiff testified that she has felt better after the explant and is able to walk for short periods of time. Additionally, she tries to follow a strict diet with emphasis on natural foods. She is not able to model[59] or to fly[60] and

---

[59] Cassandra Carrigan testified that Plaintiff had all the qualities to become an international model: she was disciplined and intelligent, had personality, good health and stamina, and was beautiful.

[60] Mr. Artemis Keitt Darby, III, an expert in piloting and career potential in aviation, including earnings, testified that from his examination of Plaintiff's flying record, including her commercial multi-engine rating, her class I medical certificate, and her hours of flying time, her membership in flying related organizations including the Aircraft Owner Pilots Association and the Civil Air Patrol, her college credits, and her contacts with a local charter airline company, that Plaintiff had made above average progress and had the means and desire to achieve her goal to become a professional pilot with a major airline. Darby opined that Plaintiff's lost income from her inability, due to her physical problems, to attain this goal of being an active pilot for an airline from age 32 until age 60 with a life expectancy of 80 years was $5,479,700.

Mr. Iver Johann Anker, a pilot who owned a charter airline business and practiced flying with Plaintiff during 1991 and 1992, testified that Plaintiff could have been hired by his company as a first officer or co-pilot of a Lear jet at $150 per day for each day flown based on his observation that she was a very skillful pilot and because of her outstanding people skills. Her above average progress toward becoming a pilot was also confirmed by Mr. James Foster Wallace, Plaintiff's flight instructor in multi-engine aircraft systems during 1991 and 1992. He testified that Plaintiff took her commercial single-engine check ride and her multi-engine instrument check ride tests on the same day, which he felt was quite an unusual undertaking and was accomplished by only a small percentage of students. He stated that Plaintiff was very determined to be a pilot, that he would rate her above average in abilities, and that she definitely "had what it takes" to become a pilot. He also noted that, on occasion,

has not found a career for the future. However, she described herself as a fighter and stated that she has not given up hope that she will find something that she is able to do.

Plaintiff filed an application for Social Security disability benefits on November 24, 1994 and was approved for Social Security disability payments on February 22, 1995.[61] She has continued to receive such disability payments since that time.[62]

The evidence is insufficient to persuade the Court that Plaintiff suffers from anorexia or bulimia[63] or that her long-

---

Plaintiff indicated that she was not feeling well and had canceled her training lessons at times because of this.

Darby noted that because they are in such a minority among the population of commercial airline pilots as a whole, qualified female pilots are in great demand and can expect to be given preference in the competition for hiring. He also stated that while the major airlines used to obtain most of their pilots from the military, now they are looking at civilian pilots who often have several thousand fewer hours of flight time, with minority pilots, including females, having a two times greater chance of being hired than the general population of civilian pilots.

[61] Dr. Campbell diagnosed Plaintiff as having silicone related connective tissue disorder during the Social Security application process. Plaintiff's Exhibit 1.81(a). He testified that Plaintiff cannot fly an airplane with her condition and cannot be a model. Dr. Houston also participated in the Social Security application made by Plaintiff and testified that receiving Social Security disability payments was a way for Plaintiff to regain her self respect, to have her own income, and to contribute financially in her marriage. She reported that Plaintiff had used these funds to pay the closing costs on a new house for herself and her husband. Dr. Houston's letter to the Social Security Administration is Plaintiff's Exhibit 1.97(a).

[62] Defendant's Exhibits 1246, 1248, 1249, & 1232.

[63] Dr. Gaffney testified that he treats anorexics who have a mental image of themselves as being overweight and whom he

31

refers to others for psychological counseling. However, he did not feel that Plaintiff was an anorexic and did not refer Plaintiff for psychological counseling. His notes reflect that Plaintiff often complained about how low her weight was and stated that she wanted to gain weight. Similarly, Dr. Jahagirdar testified to Plaintiff's weight loss and gain, noting that Plaintiff always wanted to gain weight and was concerned about weight loss. Dr. Campbell testified that Plaintiff weighed 98 pounds on May 12, 1994 when he saw her after the explant and that her health had declined. He explained that her malnourishment was caused by the sores in her mouth which made eating difficult, and that when she did eat, it was more difficult for her body to absorb the food normally due to her stimulated immune system which was having difficulty fighting her other problems. In his view, Plaintiff always wanted to gain weight, and he did not diagnose her with an eating disorder. He noted that she had improved when she had gone to a spa where her nutrition was more balanced. He expressly rejected Dr. Klein's diagnosis of anorexia nervosa, stating that he had referred Plaintiff to Dr. Klein, a gastroenterologist, whom Dr. Campbell testified did not have the expertise to make this diagnosis and wanted to refer Plaintiff to a relative who was a psychiatrist in Tampa, Florida. Similarly, Dr. Houston stated that she assessed whether Plaintiff's weight loss was self-induced and found not only that there was nothing to indicate this but also that just the opposite was the case, that Plaintiff wanted to gain weight, that Plaintiff had no image of herself as being overweight, and that an eating disorder should be excluded as a diagnosis.

Dr. Caldwell agreed that the lesions and ulcers seen by other physicians on Plaintiff's visits could interfere with eating, and he testified that he did not believe that Plaintiff attempted to voluntarily achieve the unusually low weight recorded by Dr. Campbell. He testified that Dr. Klein's final diagnosis was Irritable Bowel Syndrome with suspicion of anorexia for which he suggested referral to his "brother-in-law". Dr. Caldwell pointed out that no physician seeing Plaintiff more than one time diagnosed anorexia, and he did not diagnose Plaintiff as having anorexia. This assessment was corroborated by Dr. Wadsworth who testified that he could not confirm anorexia as part of his differential diagnosis of Plaintiff's symptoms and signs. Deposition of Wadsworth at 19. In addition, Dr. Lebioda, who saw Plaintiff only once, testified that his records show concern with bulimia, but that it was not included in his impressions, nor did he diagnose Plaintiff as having bulimia. Deposition of Lebioda at 45 & 52. He preferred to stay within the area of his expertise, gastroenterology. Id.

However Dr. Klein, also a board certified

term physical and emotional problems occur or occurred because
of a fondling incident by a Federal Aviation Administration
("FAA") physician[64] or that her problems stem from
hypochondriasis.[65]

---

gastroenterologist in Texas, saw Plaintiff three times, on
June 16, 17, and 20, 1994, on referral from Dr. Campbell.
Deposition of Klein at 8 & 17. He diagnosed anorexia nervosa,
a psychiatric disorder, and gave her his brother's name and
address, recommending she start psychiatric therapy. Id. at
14-17 & 49.

[64] Dr. Houston initially treated Plaintiff four times in
1992 for symptoms resulting from an unauthorized fondling by
an FAA medical examiner during a medical examination which was
required for Plaintiff to obtain her pilot's license.  Dr.
Houston then diagnosed Plaintiff as having major depression,
single episode, and also post-traumatic stress disorder,
noting that Plaintiff expressed a number of depressive
symptoms which were more acute than chronic, and that she did
not appear to be biologically depressed since childhood.
However, Dr. Houston felt then that Plaintiff's depression
seemed "out of line" with this incident, and Dr. Houston could
not discern an explanation for this. When Plaintiff returned
for treatment in October of 1994, Dr. Houston viewed it as an
opportunity to investigate an underlying morbidity.  Dr.
Houston's diagnosis based on her treatment of Plaintiff from
October 1994 until April of 1997 was that Plaintiff had a
major, severe depression based on an underlying medical
condition from silicone poisoning.

[65] Dr. Caldwell testified that one reason he diagnosed
Plaintiff as having hypochondriasis was the fact that she
listed 85 complaints on the Multi-District Litigation Panel
form, although when he examined her she did not then say that
she had all of these complaints.  He stated that the
"incredible" list on this form indicated that her problems are
psychological, not organic or physical in nature, and since
they involved different body systems, did not fit into one
disease.  However, Dr. Kotzin, an expert in immunology
presented by Defendant, testified that he had other patients
with symptoms similar to those of which Plaintiff complained.
From review of the evidence and the demeanor of the
witnesses, the Court determines that the visits to the variety
of physicians were sincere attempts by the Plaintiff to find
the cause of, and treatment for, the many, real physical
problems from which she suffered, and were not manifestations
of hypochondriasis as Dr. Caldwell opined. Dr. Caldwell

33

testified that many of Plaintiff's complaints, such as rashes, Irritable Bowel Syndrome, sore throat, loss of hair, and pain and stiffness in her neck, had occurred before she had implants. In his reference to these as intermittent problems he glossed over the severity of many of Plaintiff's physical problems, which appeared over time after her implant procedure, many of which became chronic, and which are documented in the records of several physicians who treated Plaintiff as a patient. Dr. Caldwell's diagnosis of Plaintiff was that she: (1) has mild depression, (2) has probable significant hypochondriasis, the symptoms of which are psychologically, not organically, induced and (3) does not have immune disfunction or systemic disease. The determination of "probable significant hypochondriasis" was based on Dr. Caldwell's observation that Plaintiff was overly concerned with her bodily functions, was not compliant, "doctor-shopped," had what he felt was an unusual, bizarre relationship with her husband, and had some social disorders. Dr. Caldwell stated that he did not diagnose the etiology of the Plaintiff's depression, which he felt pre-existed her implants, although he had read Dr. Houston's testimony that the loss of her breasts and inability to work in her chosen career were some of the reasons for the depression. Before he rendered his diagnosis, Dr. Caldwell did not discuss with Plaintiff her emotional feelings about the state of her breasts at the time of his examination of her or the reason that she did not live full-time with her husband, which he described as an abnormal relationship. He testified that he did not decide if loss of her breasts was sufficient trauma to cause Plaintiff's depression.

Dr. Caldwell appeared to have approached his examination of Plaintiff with the purpose of reaching his already firmly formed conviction that there was no relationship between silicone gel breast implants in women and immunological problems or systemic disease. Dr. Caldwell examined Plaintiff on one day for a total of 24 minutes and read, not completely accurately as cross-examination showed, her medical records. Although highly published in peer reviewed articles in his areas of expertise, Dr. Caldwell has written only once on silicone gel breast implants, an editorial which was not a scientific essay and which appeared in the Florida Medical Journal in 1994. This editorial was not peer reviewed and represented his personal view that there was no association between such devices and connective tissue disorder. As he testified, he wrote the editorial because he was upset because he felt the statistics which claimed there was a relationship between breast implants and collagen connective tissue disease were so poor. Dr. Caldwell testified that before Plaintiff was examined by him he believed, and now still believes, that silicone does not cause a disease.

## B. DEFENDANT'S SILICONE GEL BREAST IMPLANT

Silicone is a term used to refer to thousands of compounds belonging to hundreds of classes with diverse uses in its forms of liquid, powder, solid, or gas. It can be toxic to not toxic, hydrophobic to hydrophilic, inert to reactive. Silicone is a man-made polymer and thus is distinguished from silicon, the element.[66]

Dr. David Franklin Williams[67] described how the development of the family of silicones in the 1930s to 1940s quickly resulted in the development of medical products

---

[66] Silicon is an element just below carbon on the periodic table with chemical properties analogous to those of carbon. After oxygen, silicon is the second most common element within the earth's crust. But silicon is not found by itself in nature. It is found predominantly in the form of silicates and silica and most commonly appears in compounds containing oxygen; it is in rocks and sand.

[67] Dr. Williams, who was qualified as an expert witness in materials science and biomaterials, has received many prestigious awards and honors for his work on materials used in the construction of medical devices. His curriculum vitae is Defendant's Exhibit 1162. He has published over 250 scientific papers and been involved as author or editor of 30 books. He has acted as a consultant in countries throughout the world and has been retained since 1993 as an expert by Defendant BMS, earning between $250,000 and $300,000 for his work as a consultant and expert witness in breast implant litigation. Dr. Williams has spent 30 years researching medical products and devices, including silicone devices, testing them for biocompatibility, or the interaction between the body and biomaterials. However, his work with silicone has been primarily with elastomers, and he has not worked with silicone gel or fluid. He stated that since silicone gel, fluid, and elastomer are based on the same polymer structure and chemistry, he felt that he could extrapolate from his experience with the elastomer in testifying about the silicone gel breast implant. He has neither addressed a professional seminar nor spoken to the United States Food and Drug Administration ("FDA") with reference to his opinions expressed at trial on the silicone gel breast implant.

AO 72A
(Rev.8/82)

because tests showed that silicones were low in toxicity and relatively inert. Thus, in the 1950s silicone was used in tubes, catheters, and hydrocephalic shunts, and its use was expanded to soft tissue reconstruction of the face, to reattach detached retinas through fluid injection in eye surgery, and for the development of artificial skin for repair of burns, wounds, and chronic ulcers.[68] Dr. Williams reported that the first clinical use of silicone in breast implants was in 1962 by Dow Corning. Silicone was chosen for breast implants because it had been widely used successfully for medical devices, it could be made to be soft and flexible, and the combination of silicone gel, giving softness and flexibility, within the silicone shell, giving the gel shape, provided a level of performance that could not be obtained from any other combination of materials.

In 1969, Wilfred Lynch, who had developed an expertise in plastics engineering and had become involved with silicones in the 1950s when it was a fledgling industry, formed Defendant MEC in order to manufacture and sell products made from silicone.[69]  Incorporated in the State of Wisconsin, MEC did

_____

[68] In the latter, the skin cells of the patient are grown in the laboratory on a silicone elastomer sheet. The new skin is placed face down on the skin with the silicone elastomer on top. After the new skin forms and heals, the silicone elastomer is peeled away.

[69] Lynch also taught courses in silicone chemistry at the University of Wisconsin and holds a professional engineer's license in that state. He has written a 1976 book entitled "Handbook of Silicone Rubber Fabrication" which became a "bible" of the industry, and included printings in Japan and

AO 72A
(Rev 8/82)

business under the name of "Surgitek" in the designing, engineering, and selling of breast implants and other medical products. During the first three years of MEC's existence, Lynch designed and selected the materials for MEC's breast implants. The silicone gel breast implant was manufactured in 1970 under Lynch's tutelage, and MEC began selling it commercially in late 1971.[70]

In 1973, Lynch sold his interest in MEC to David Sanders who then became MEC's president while Lynch became an MEC employee for three years. Thereafter Lynch entered into contracts with MEC and worked as a consultant for the company for approximately twelve years.[71]

Lynch gave extensive testimony at trial concerning the manufacturing process and the tests performed by MEC on the components of its silicone gel breast implants and the finished devices during the course of the manufacture and sale of such devices. In addition to the testimony of Lynch, Defendant's witness Dr. John Martin Zeigler[72] and Plaintiff's

China. In the late 1980s, he authored a book entitled "Implants: Reconstructing the Human Body." His occupation at age 78 is working as a consultant in the applications of silicones to medical devices. Deposition of Lynch at 2394-2403.

[70] Deposition of Lynch at 2909; Plaintiff's Exhibits 2.214 & 2.212.

[71] Lynch also acted as a consultant for another subsidiary of Defendant BMS named XOMED. Lynch has been an expert witness for BMS and MEC in lawsuits involving breast implants.

[72] Dr. Zeigler, an expert witness in chemistry, silicon chemistry, materials science, failure analysis of polymers,

37

witness Dr. Pierre J. J. B. Blais[73] gave detailed descriptions

from the trace cards and lot histories of Plaintiff's implants

of the process for MEC's manufacture of a single-shell, gel-

filled breast implant of the silicone variety.

---

and crystallography, holds a doctorate in organic chemistry and worked on silicon-based polymers for over 8 years with Sandia Laboratories. Dr. Zeigler holds 24 patents on silicon polymers and silicon gel, 11 of which are in the United States. He has published articles on silicon polymer chemistry and authored a book entitled "Silicon Based Polymer Science." Defendant's Exhibit 1255. He presently commercializes materials he has patented for his own company, serves as a scientific and legal consultant, and markets a software program which he has developed. He testified that he spends about 30% of his time in litigation, has testified in 6 cases, and has consulted with Defendant's attorneys since 1993. Dr. Zeigler testified that he has examined about 350 silicone gel breast implants and explants, including Plaintiff's explanted devices, mostly for MEC. He examined Plaintiff's explants on June 4, 1997, and prepared a report dated November 16, 1997. He has never been a consultant for plaintiffs.

[73] Dr. Blais holds a doctorate in polymer chemistry and owns several patents in the medical device field. He has published in a peer-reviewed text on breast implant techniques and the application of industrial trial materials to implants. He was qualified as an expert to testify in the areas of polymer science, chemistry, crystallography or the geometry of molecular assembly, and the design defects and failure analysis of medical devices, including silicone gel breast implants. Dr. Blais worked for 13 years in the Canadian Bureau of Medical Devices, Department of Health and Welfare, where he examined retrieved devices, including breast implants, for clinical merit. In 1979, he proposed that all devices implanted for a period lasting over 30 days be required to obtain premarket approval. His recommendation was enacted into law in Canada on April 1, 1983. Dr. Blais left his post with the Canadian government in late 1989 amid controversy about which he was extensively cross-examined during trial. Since then, he has continued work with polymers and teaches polymer chemistry and the pathology of tissues interacting with artificial substances, among other subjects. He testified that he has examined 7500 to 8500 breast implants from over 4600 persons and has extensively studied MEC's documents. He has been an expert for plaintiffs in breast implant cases since 1983.

38

In 1976 when MEC began using Dow Corning products for its breast implants, it received the shell and gel in kits sold in metal cans containing the numbered product lot, claims of suitability, and instructions, including expiration date and conditions of use. MEC then mixed and processed the components and added its own components, such as zinc stearate to help remove the shell from the mold.[74] It then marketed

---

[74] Dr. Blais and Dr. Zeigler were questioned extensively about problems in the manufacture of breast implants and, not surprisingly, had opposing opinions. Dr. Blais elaborated on the effect of the heating process on the composition of the gel during the manufacturing process, the debris from the reuse of molds, the platinum catalysts used in the shell and gel, the catalyst from the peroxide family used in the patch applied to the elastomer after it has been removed from the mold, the acetylene anti-catalyst used in the gel to hold the reaction process in check, and the zinc stearate coating on the elastomer mold which enabled the elastomer to be peeled from the mold more easily. Blais described a procedure known as "doping" or "floor reformulation" by which a technician faced with a kit for gel components close to or after the expiration date would add materials to override the expiration date. Dr. Blais testified that even within one batch of gel containing the same substance injected into different implant elastomers, the manufacturing process involving heating and different impurities in the shell can cause different reactions, leaving some implants with more or less oil and impurities than others made from the same batch of the injected material. Dr. Zeigler contested Dr. Blais' testimony as to impurities being in the shell or gel. He testified that he tested Plaintiff's explants and that they passed the cohesion and viscosity tests, the tests for heavy metals, and the tests on identity and purity of materials. He found no impurities in the materials in Plaintiff's explants. He also testified that zinc stearate has no effect on the gel and is washed off the shell without getting into the shell or leaving holes in it. Further he opined that zinc stearate has no effect on the shell strength or cohesion, does not prevent the gel from becoming a gel or prevent the gel from adhering to the shell, and has no measurable effect on the cohesiveness or quality of the gel. Dr. Blais and Dr. Zeigler also disagreed as to whether the material used in Plaintiff's implants was out of date or expired, whether there was "crazing" around the patch of the implant and whether there was a high machine

AO 72A
(Rev 8/82)

its breast implants to physicians accompanied by a package insert.

Dr. Zeigler testified from his review of the documents concerning MEC's tests of physical properties of its silicone gel breast implants such as the tests for tear strength,[75]

---

force used in the application of the patch resulting in increased bleeding, whether peroxide was used as a catalyst in the manufacturing process, whether one of Plaintiff's implants was reworked or only repackaged and resterilized, whether the two implants had different patch constructions and different gel viscosities, whether 2,6 CIS was created as a degradation product within the gel, whether MEC violated manufacturing instructions in making the implants, and whether Plaintiff's implants had permanent creases or places of defective bleed due to the crease-fold theory. Contrary to Dr. Blais' testimony, Dr. Zeigler opined that not only do silicone elastomers generally not wear out in the body, but also such devices are free of flex fold failure which does occur in saline breast implants. Therefore, Dr. Zeigler stated, silicone gel breast implants with creases are safe for sale. Dr. Zeigler concluded that Plaintiff's implants were manufactured according to protocol, that this protocol of MEC was proper, that they were not defectively manufactured in accordance with MEC specifications, that there was no evidence of crazing, deviation in thickness to produce herniation, a bulge, or rupture, no excessive pressure was applied to the patch, there was no degradation or imminent rupture in the implants, and they are not defective in any way today. While Dr. Zeigler stated that he agreed with Mr. Lynch that silicone rubbers are very pure materials with no leachable additives and are very bioacceptable even over a human lifetime, he stated that the platinum catalyst used for cross-linking is not leachable. Dr. Zeigler testified that he found no evidence of defect in the shell or gel of either of Plaintiff's implants. However, Dr. Zeigler admitted that he had never himself tested the materials used in the silicone gel breast implant for suitability.

[75] Dr. Zeigler testified that the material in the shell of Plaintiff's implants could stretch over eight times its original length before it would break.

40

tensile strength,[76] percent of elongation or extension tests,[77] thin spot testing on the elastomer shell, crease fold and rotary flex testing,[78] and equilibrium tests[79] independent of the manufacturing process as well as the tests performed by MEC during the manufacturing process such as gel cohesion tests,[80] gel viscosity tests,[81] and gel handling tests.[82]   Dr.

[76] This is the measure of force per unit for cross-sectional areas of the shell.

[77] This test is to determine the amount of force necessary to tear a sample of the shell with a nick in it made according to a standard.

[78] Both Dr. Blais and Dr. Zeigler testified about the crease fold theory in which it is postulated that if the implant creases and there is repeated motion across the crease, weakness in the shell will occur and result in rupture across the crease line. Dr. Zeigler disputed Dr. Blais' testimony that there was a crease fold in Plaintiff's implant. Dr. Zeigler further testified that any creases in Plaintiff's implants are not visible now and did not weaken them or contribute to an increase of gel bleed.

[79] Dr. Zeigler noted that the permeation process introduced molecules of gel into the elastomer causing it to swell and reduce its tensile strength, tear strength, and percentage of elongation but without progressively weakening the shell.

[80] This test measures how well the gel sticks to itself. Dr. Zeigler stated that within one lot of silicone gel, some gel could pass and some gel could fail the cohesion tests due to inherent error in the experiment or within the measurement in terms of its reproducibility.

[81] Dr. Zeigler noted that viscosity is a measure of the resistance to flow of the gel and testified that Defendant's gel was more highly viscous and therefore less likely to move away from the site in case of rupture of the implant than the gel used by other manufacturers of breast implants.

[82] Dr. Zeigler admitted that from the different handling tests performed by MEC on its gel, MEC knew that cohesion of the gel was affected by handling.  Rough handling made the gel less cohesive.  However, he stated if the gel is allowed to

Williams, an expert in materials science and biomaterials,
also elaborated on the tests conducted by MEC from his review
of the documents, including tests for acute systemic
toxicity,[83] intracutaneous tests,[84] implantation tests,[85] tests
for hemolysis,[86] cytotoxicity,[87] and pyrogenicity,[88] and

sit, it returns to its original cohesiveness, and the handling
does not result in degradation of the gel. In taking issue
with Dr. Blais' testimony that in vivo mastication through
movement of the muscles caused more gel bleed, Dr. Zeigler
focused on the issue of whether mastication caused release of
oils from the gel. While contending that mastication never
causes the gel to revert to oil, Dr. Zeigler did not address
the issue of whether mastication increases gel bleed. Mr.
Golwitzer testified that the gel is fragile, has no tensile
strength, and tests conducted for MEC showed that massage
would affect the gel, making it weaker and less hard.
Deposition of Golwitzer at 171-79.

[83] This involved injecting a substance derived from the
material in an animal, usually a mouse. MEC did many of these
tests on its 515 gel materials and 517 elastomers material
obtained from Dow Corning.

[84] In this test, the material is extracted and injected
into the skin of an animal, usually a rabbit, which is very
sensitive, to observe for redness, sweating, or other
alteration. Dr. Williams testified he saw many results of
these tests done by MEC.

[85] In this test, the material is implanted subcutaneously,
usually in a rabbit, for a minimum of 72 hours and up to 90
days. The animal is observed, then sacrificed and examined by
eye and under a microscope for evidence of a reaction compared
with a negative control. Dr. Williams testified that in his
opinion a 90-day test was sufficient in length to determine
biocompatibility because all the irritant will subside and
equilibrium will be established during this time. He testified
that a 90-day test in a rabbit is a long-term test in
comparison to the way the body can respond.

[86] In this procedure red blood cells are placed in contact
with the material to determine sensitivity. If damaged, they
will release hemoglobin.

[87] Cytotoxicity is tested by placing actual cells in
contact either with the material or with an extract from the

42

infrared[89] and heavy metals tests.[90] Defendant's witnesses opined that these tests were appropriate to determine biocompatibility of the silicone shell and gel, and the types and numbers of each test showed that the material was highly acceptable for use in implants. However, none of these tests was designed to determine the effect of gel bleed on the human host.[91]

Lynch testified that he knew from his first involvement with the manufacture and distribution of MEC's silicone gel/silicone elastomer breast implants that they bled.[92] MEC knew of gel bleed from the inception of its sale of the silicone gel breast implants to physicians and prior to the

---

material.

[88] This test looks at the possibility of bacteria in conjunction with the material. A sterilized material is implanted, and the animal is observed for fever.

[89] In this test, infrared light is passed through the material dissolved in chloroform, and a peak is seen on a graph to which a standard reference is applied.

[90] According to Dr. Williams, MEC did many of these tests on the shell and gel using atomic absorption spectroscopy in which the amount of light passing through a flame derived from burning the materials produces wave lengths of different elements which gives rise to a spectrum of absorption concerned with the frequency of atomic vibration.

[91] Dr. Williams testified that he had not seen any test documents from MEC's Scientific Affairs Committee on gel bleed.

[92] See, e.g., Deposition of Lynch at 1942-44 & 2502. Lynch testified that gel bleed can be seen from the residue left when a silicone gel breast implant is placed on a piece of paper on a flat surface.

43

manufacture and sale of the implants inserted into Plaintiff.[93] Lynch described gel bleed as the phenomenon in which the "lites," or low weight molecules in the silicone gel, "go into solution," passing through the silicone elastomer shell and coming through such membrane's outer side, in part due to the permeability of the molecules which make up the silicone elastomer shell.[94] The higher the weight of the molecule, the

---

[93] See, e.g., Plaintiff's Exhibits 2.84, 5.73, 5.75, 2.237, 3.220, 3.248, 3.273, 3.496, 8.42, & 8.248; see also Plaintiff's Exhibit 3.140. Gary Golwitzer also described the tests that he and Rita Taylor developed and conducted for MEC on silicone gel breast implants. Deposition of Golwitzer at 70-73, 146, 178, 182, 192, & 199. These tests dealt with the physical properties of the implant materials.

[94] Lynch explained that the weight of the molecule is related to the number of atoms in it. During the chemistry in forming the silicone polymers for breast implant shells and gels, catalysts are used to cause cross-linking of molecules. Both short and long chains of molecules are formed. The molecular weight is related to the length of the chain. Some molecules will have short chains that are highly cross-linked and thus have a higher molecular weight than those with longer chains but less cross-linking. Some molecules are highly cross-linked with resulting higher molecular weight and some are not. The more volatile moieties are called "lites," which in silicone polymers are short chained molecules with no cross-linking and low molecular weight. Silicone polymers contain mixtures of molecules with different weights. Lynch testified that no matter who the manufacturer is, "lites" are always present in the production of silicone gel even though the gel may be treated during the manufacturing process to reduce the number of "lites". Two batches of silicone gel can be similar or radically different depending on the amount of "lites" each contains despite being made from the same compounds and according to the same recipes. Thus, if two silicone gel batches have different molecular weight distributions, their properties can differ. The lower weight molecules in the silicone gel migrate more quickly through the membrane of the silicone elastomer shell. According to Lynch, it is not possible to determine how many lower weight molecules or "lites" will bleed through the shell from batch to batch of silicone gel.

slower the gel bleed.  Lynch stated that it might take ten years for some higher weight molecules in the silicone gel to bleed through the silicone elastomer, but both high and low weight molecules in the silicone gel will bleed through the silicone shell.  A bleed plateau will be reached eventually and maintained if the implant is not further disturbed.

Lynch knew this in 1969 when he formed MEC.  From his own tests, Lynch determined that gel bleed occurs in all silicone gel breast implants in which silicone gel is contained in a silicone elastomer shell, regardless of the manufacturer. Lynch tested different kinds of commercially available silicone gel breast implants and found they all bled, even after being implanted in women.  Further, his tests confirmed that both low and high weight molecules in the silicone gels bled through the silicone elastomer shell in all silicone gel breast implants with silicone shells, regardless of the manufacturer.  Further, from testing different viscosities of silicone gel, Lynch determined that the only difference between the gel bleed of lower weight molecules and that of higher weight molecules was the rate of the gel bleed.  Higher molecular weight molecules of the silicone gel bleed through the silicone elastomer but do so more slowly.  However, none of the tests done by Lynch or by MEC were conducted for a sufficiently long period of time to determine at what molecular weight, if any, the gel bleed would stop.

In addition, when Lynch began the manufacture and sale of

45

breast implants, he knew that Dow Corning and others had experience with direct injection of a liquid silicone, the same material produced as a "lite" in the silicone gel in MEC's breast implants, with resulting complications and death.[95] Lynch testified that when he began the manufacture and sale of silicone gel breast implants through MEC, he had read about the experience of another manufacturer, Dow Corning, with direct injections of liquid silicone, or polydimethylsiloxane, and the resulting complications when the substance entered into the blood and lymphatics of the human host. Further, he knew from his research that women had died from injections of liquid silicone. While admitting that the injected silicone was the same as the "lites" produced in the silicone gel manufactured for silicone gel breast implants by MEC, Lynch explained the difference was, in his view, that injecting 300 cubic centimeters of silicone liquid is not the same as the minuscule amount of silicone gel that seeps through the silicone elastomer of MEC's breast implants. However, he testified that it would be irresponsible for a plastic surgeon to inject silicone directly into a woman's breast because the result of such injection is known.

While acknowledging that prior to its manufacture and

---

[95] Lynch stated that even after the FDA banned direct injection of silicone fluids except into the face, direct injections of liquid silicone into the breast were still done with harmful results. Further, when the FDA began regulating breast implants more stringently, Lynch testified that the demand for them was so great, women "went underground" to obtain them.

sale of silicone gel breast implants MEC did not test to determine the effects of silicone on the body's immune system, the effects of migrating gel on the body, the amount of gel bleed, or the life expectancy of a silicone gel breast implant, Lynch testified that this testing was not done because MEC felt there was so little gel escaping from the elastomer and further because MEC believed that its gel was so cohesive that it would not migrate far. Although at this time saline-filled breast implants were being sold on the market, silicone gel implants were preferred by MEC because Lynch felt that silicone was biocompatible and that the silicone elastomer was the most compatible elastic material, being odorless and tasteless, containing no toxic heavy metals, and showing a complete lack of toxicity and minimum tissue reaction when implanted in animals.[96]

---

[96] At first, Lynch had selected the Perras-Papillon breast implant for sale by MEC. It did not bleed because it did not have a pure silicone envelope. Dr. Perras asked Lynch to develop a silicone gel-filled implant, and she and Dr. Papillon assigned their patent to MEC. The Perras-Papillon implant manufactured by MEC used XD-1 for the shell, a copolymer material, manufactured by General Electric which MEC called "114". Deposition of Lynch at 2413-15. Prior to marketing this implant in late 1971, MEC tested the shell material in rabbits for five to ten months without tissue reaction. Id. at 2416-19. The shell material was also subjected to toxicological testing with no significant acute toxicity of heavy metals reported. Id. at 2419-23. The Perras-Papillon implant was filled with a silicone polydimethyisiloxane gel, also obtained by MEC from General Electric, which was labeled by MEC as "122". The silicone gel was also subject to acute toxicity, pyrogenic, and heavy metal testing with no toxic results reported. Id. at 2425. Ninety-day tissue reaction tests of the silicone gel were also performed on rabbits. Id. at 2427. When MEC began using a different General Electric material for its breast implant

47

In 1971 and 1972, there was no standard or regulation requiring the completion of tests on animals before a medical product was surgically placed in humans.[97]  Before the silicone gel breast implant was marketed and released for sale to physicians, MEC did no limited clinical study on a small group of women nor did MEC do a study of the effect of such

---

shells in 1973, called "MEC-127," it was also tested for tissue reaction by being implanted in rabbits for ninety days. Id. at 2430-34.  Lynch also authorized Dr. Perras and Dr. Papillon to implant these MEC devices in women in Canada in a clinical trial with the following report:

> Perras, Papillon, Bosse of Montreal, Canada, and Korkos of Milwaukee have implanted a large number of devices manufactured from MEC-114 and reported noticeably less inflammatory tissue reaction than that experienced when similar devices manufactured from medical grade dimethyl silicone were implanted.

Id. at 2437.  These clinical trials authorized by Lynch were not to determine biocompatibility but instead were to determine the practical nature of the implant's design.  Id. at 2442.  These rabbit studies did not last as long as the beagle studies referenced later in this opinion.  Id. at 1705-08; see also id. at 2903; Defendant's Exhibits 942 & 904.

[97] The initial FDA standards for breast implants fell under FDA rules for the types of containers in which foods or drugs can be placed (Food Contact Series 6 Standards).  As explained by Dr. Williams, in the late 1960s to early 1970s there was an absence of formal standards for testing biomaterials for implanting, so manufacturers followed their own initiatives.  The U.S. Pharmacopeia had test methods for determining suitability of plastic containers for drugs, and manufacturers used these standards for testing biomaterials for implants.  In 1980, the 20th edition of the U.S. Pharmacopeia included a sentence that these tests were appropriate for determining the suitability of plastics for implants in humans and gave three types of tests to determine suitability of polymers for implanting from the biologic point of view.  Defendant's Exhibit 1270.  From his review of the MEC documents, Dr. Williams opined that MEC did all of the tests stated in the U.S. Pharmacopeia, lasting from 72 hours to 90 days, without finding significant evidence of toxicity or reaction attributed to implant material.

AO 72A
(Rev.8/82)

implanted device in animals.[98]  According to Lynch, the only testing MEC did before releasing its silicone gel breast implants for sale was to test the biocompatibility of the silicone elastomer shell on the body by testing the localized reaction of tissue samples to various shell materials and to conduct tests on beagle dogs.  Thus, prior to the sale of its silicone gel breast implants, there was (1) no testing by MEC to determine the effects of silicone gel on the body's immune system, whether from gel bleed, rupture, or degradation of the implant, (2) no testing by MEC to determine the effects of migrating silicone gel on the body, (3) no testing by MEC to determine the amount of silicone gel bleed that occurs in the body, and (4) no testing by MEC to determine the life expectancy of a silicone gel breast implant.

In 1976 Sanders of MEC established a Scientific Affairs Committee within the company and made Lynch a member of it. MEC disseminated information to the public and to physicians, stating that this committee would study: (1) capsule formation

---

[98] Lynch testified one reason for this was that MEC was unable to find an exact animal to substitute for a human.  In addition, MEC felt that there was very little silicone gel bleeding through the implant shell, although Lynch did admit there was some opinion at that time that gel bleed might play a role in the degree of capsular contracture around the implant in the human breast.  Lynch stated it would take too long to determine the life of the device, perhaps 50 years, and long-term testing would have to be on an animal, not a woman.  He opined that long-term implants in a dog would not yield much information.  Lynch testified that MEC felt if it could prove the materials were not toxic and did not contain heavy toxic metals, that probably meant more than any animal test that MEC might conduct.

49

and the part played by silicone gel in such phenomenon, (2) silicone gel migration and its interaction with various tissues of the body, and (3) the resultant pathology and toxicology of tissues that interfaced with silicone gel breast implants. MEC publicized this committee and its ostensible work to physicians using its products, to its own sales representatives who were making sales calls on physicians, and at various seminars and physicians' meetings. However, these publicized studies were never undertaken by MEC.

Lynch testified that in 1977 he also attended an Ann Arbor, Michigan scientific meeting at which was discussed a study to be conducted on capsular contracture and human immune response as well as other matters and which was to be jointly funded by manufacturers of silicone gel breast implants. However, MEC never funded a study of this nature to examine the immune response of women receiving silicone gel breast implants, nor did it participate with other manufacturers to fund such study.[99]

In 1977, Sanders wrote a letter in response to questions

---

[99] E.g., Deposition of Lynch at 2877 & 2910. Lynch stated that not only did MEC not put $25,000 into such study, but also that this amount would not cover MEC's share of such study. Further he felt that the 100 patients proposed for this study would be too few. According to Lynch, it would take thousands of patients to conduct an appropriate study. In addition, two patient populations would be necessary, one whose members received silicone gel breast implants and one whose members did not receive silicone gel breast implants. There would have to be enough participants involved in the study to make a statistical determination whether the immune system is affected by silicone gel bleed.

50

from a physician at the University of Florida, stating in part:

> 5. We feel that the SURGITEK R mammary prostheses are superior to others on the market because:
>
> A. Our gel is noted for its consistency and that when a shell is ruptured the gel <u>will</u> <u>not</u> <u>run</u> or migrate through body tissue as is the case with some of the competitive products.[100]

Lynch stated there was no data to support the statement of Sanders on behalf of MEC that there was no migration of silicone gel through the body's tissues.[101]

Sanders further wrote in this 1977 letter:

> 7. At this time we do not have any quantitive [sic] data on the bleeding process of silicone gels through silicone shells. Qualitatively we know that it occurs and this can be seen simply by lying [sic] a prosthesis on a piece of paper. As you know, we discussed the confidential project that Medical Engineering

---

[100] Plaintiff's Exhibit 2.84. This statement was echoed in an August 18, 1981 letter from MEC's vice president of scientific affairs in response to questions from a doctor:
Dr. Luhan, please be assured that we are vitally concerned that our implants are of the highest quality available on the market. To this end we want them to have a shell with sufficient strength to withstand normal forces without tearing while <u>in situ,</u> but with a gel so cohesive that even if the outer membrane should rupture the gel inside will not migrate. We have just performed studies in house which confirm that our shell has outstanding strength properties and the gel it contains is the most cohesive on the market. A copy of that study is included for your review.
Plaintiff's Exhibit 8.69.

[101] Lynch acknowledged that even a cohesive gel will bleed through a silicone elastomer shell in a breast implant. Lynch stated that MEC believed, without conducting tests or accumulating data, that its gel was so cohesive it would not migrate far.

AO 72A
(Rev.8/82)

Corporation is in the midst of planning and financing to find out the answer to this exact question.

* * *

9.   A supplier has indicated to us that all but 1% of the short chain molecules of "lights" have been removed from the rubbers prior to their being shipped to us.  Our laboratories after applying vacuum and heat for approximately six hours has [sic] been able to remove approximately the remaining 1%.

Shel, this does not mean that additional silicone cannot migrate through the shell, because they [sic] still do [sic].  We have proved this qualitatively as cited in Item 7. Again, the confidential study I cited in #7 will attempt to answer this question, also. Of course the real interesting question is what does any migrating silicone do to tissue. The study will also attempt to answer that question.

10.  We are not saying that the make-up and physical characteristics of the shells change with time.  However, we do believe that there are changes and we do believe that the low molecular silicone migrating from the gel through the shell might slightly change the physical properties of the shell.   This phenomena [sic] becomes static after a period of time and certainly does not change the nature of the implant to the extent that it would make it risky or hazardous for implantation.  Also from a theoretical point of view, that the more the implant is handled, maybe 1,000 times, it slightly weakens the shell each time the unit is handled. Therefore, it follows at some point if a unit is handled enough it might rupture with slightly less pressure or stress than when it was originally made.  Again, this is a very difficult kind of thing to measure, but theoretically, it can be shown that this is the case.[102]

Lynch stated that MEC did not have data to support these

---

[102] Plaintiff's Exhibit 2.84.

answers of Sanders to the questions about gel bleed and gel
migration contained in this letter and that Sanders was taking
the position of a marketing person in making these statements.
Further, MEC touted its breast implants as having highly
cohesive silicone gels to increase sales of its product,
knowing full well that its silicone gel would bleed through
the elastomer shell containing it and migrate into tissues
away from the breast implant.[103]  As of July 20, 1977, to the
knowledge of Lynch, MEC did not have long-term data supporting
the safety of the silicone gel it used.[104]  Nevertheless, MEC
advertised its implants as containing highly cohesive silicone
gel in order to sell its product at the same time MEC knew

---

[103] Deposition of Lynch at 1150-1151.  Cohesiveness of the
gel has nothing to do with whether the gel will bleed.  As
noted by Lynch, even a cohesive silicone gel inside a silicone
elastomer shell will bleed.  The thicker the elastomer shell
containing the gel, the longer it takes for the migrating
materials to appear at the outer surface of the shell.  Lynch
elaborated on this in a letter dated April 23, 1980 while he
was a consultant for MEC and a member of its Scientific
Affairs Committee to explain why making the shell thicker
would not reduce gel bleed in the MEC silicone gel breast
implant.  Plaintiff's Exhibit 8.42.  Dr. Zeigler concurred
that increase in the thickness of the elastomer of a breast
implant changes the rate at which gel bleed appears on the
surface of the shell but not the amount of material that is
diffusing.

[104] Lynch referred to Plaintiff's Exhibit 3.389 dated July
20, 1977 in making this statement.  According to Lynch, MEC
did not test its implants in animals, except rabbits and dogs,
beyond ninety days, and most of MEC's implant studies were
seven-day acute toxicity tests to determine if the implant
materials contained any poisonous substances.  As to the
beagle study noted below which was commenced by MEC in 1971,
Lynch testified that when DOG 450R and DOG 395R were
sacrificed in 1979, MEC did not have any long-term data on its
silicone gel 515/516 material.

53

that its silicone gel bled and migrated into tissues away from
the breast implants.

While agreeing that preclinical testing was a standard
for medical devices before 1975[105] and that it should be done
before material was implanted in humans, Lynch stated that MEC
did no clinical study lasting longer than seven weeks to
determine how long its breast implants bled.[106]  MEC's seven-
week study in 1980 of different silicone shell and gel
materials being utilized by different manufacturers of breast
implants, including those of MEC, reflected that all samples
had gel bleed within twenty-four hours and continued to bleed
approximately the same amount without tapering off over the
next seven weeks with no significant difference among the
samples.[107]  MEC did no study beyond seven weeks to determine
how long the implants bled gel, and through the date of his
deposition in February of 1994, Lynch knew of no long-term
biocompatibility testing done by MEC to substantiate the
safety of its silicone gel material for long-term implant

---

[105] Lynch referred to Plaintiff's Exhibit 30.1118, an
article by Dr. Autian, and agreed with the statement:  "Since
many of these medical devices will be implanted in humans and
other devices will have contact with drug and biological
products which in turn will enter the patient, it should be
mandatory for these items to be preclinically tested for
safety."  Deposition of Lynch at 1573.

[106] Dr. Williams testified that from his review of MEC
documents, no clinical trials were done before the silicone
gel breast implant was marketed.   Dr. Williams stated that
such trials were not required then, and no manufacturer did
them.

[107] Plaintiff's Exhibit 4.24.

AO 72A
(Rev.8/82)

use.[108]

In 1976, MEC switched from General Electric materials to Dow Corning materials for its silicone gel breast implants. However, MEC did not do clinical tests of materials it received from either General Electric or Dow Corning to evaluate them for gel bleed before they were included in the silicone gel breast implant product MEC designed, fabricated, and sold to physicians.

In a handwritten memo dated September 15, 1976, Robert Olson of MEC wrote a summary of what MEC had done to test the silicone materials used in its implants.[109] Lynch agreed with the statements in such memo that (1) at the time MEC switched from General Electric to Dow Corning materials in 1976, MEC's information on the biocompatibility of implant materials, a critical issue in implantable medical devices for humans, was the minimal reactivity of soft tissue in humans to these materials,[110] and (2) the tissue reactions of which MEC learned

---

[108] Lynch stated the purpose of the seven-week study was to determine whether a more fluid gel made a difference in gel bleed, and MEC found it did not. Lynch was not aware of any MEC data on the length of time there is gel bleed, or if the bleed is greater for a time and then tapers off. Lynch was aware of a letter written by Peter Stitch in 1981, when Lynch was a consultant for MEC, in which three types of breast implants had been placed on blotter paper. The first to bleed within twenty-four hours was the MEC silicone gel breast implant. Within four days, there was a definite pattern on the blotter paper, and the pattern continued to darken from gel bleed over the next six months.

[109] Plaintiff's Exhibit 3.450.

[110] Deposition of Lynch at 1668 & 1670.

were primarily the result of patient histories and not from any systematic procedure to gain information in an organized manner.[111]

Lynch testified that it would be irresponsible for a manufacturer to place on the market a product containing materials without first determining whether there would be biodegradation to a point that it would become dangerous or produce toxic effects.[112]  To this end, in 1971 MEC had begun placing miniature breast implants in the mammary area in twelve beagle dogs, along with other materials, to determine if the materials were biocompatible and safe for long-term use and to study capsular contracture.[113]  The beagle study involved ultimately twenty-two dogs over a period of time.[114] The first dog was implanted in January of 1971 and the last

---

[111] Lynch stated he felt these results from the field were more acceptable than studies of breast implant materials in dogs.  Id at 1670.

[112] Id. at 1695-98.

[113] Id. at 1699-1701 & 2447; Defendant's Exhibit 715.

[114] MEC sold its breast implants before the beagle study was commenced.  The beagle study was primarily to examine capsular contracture which Lynch felt might be related to gel bleed. The main purpose of implanting the beagles with several different materials was to prove the materials were similar to those materials on which physical and toxicological tests had already been done. MEC implanted silicone gel breast implants containing Dow Corning materials into some of these dogs. Deposition of Lynch at 1863-65 & 2452.  Lynch testified that he held an ownership interest in Cape Laboratories, which was one of the laboratories that participated in the testing during MEC's beagle study.  Id. At 2460-61.

AO 72A
(Rev.8/82)

dog was sacrificed in July of 1979.[115] Although the beagle research did span a seven-and-one-half-year period, contrary to the public representations made by MEC in its sales literature no dog was implanted for seven years.[116] MEC did not insert its breast implant device in any other animal except the beagles participating in this study.[117]

Adverse findings or abnormalities were found in the liver, kidney, thyroid, and lymph nodes of some beagles in this study, particularly in Dog 450R and Dog CC74.[118] MEC was

---

[115] Id. at 2454; see also Defendant's Exhibit 748.

[116] The sales literature published by MEC stated:
Long Term Implant Studies in Dogs:
    Materials used in the SURGITEK Mammary Implant are subjected to implant evaluations in dogs for periods up to seven years. Test animals are given frequent physical examinations for determination of untoward results such as carcinogenic reaction. Specific animals are sacrificed annually with complete histopathic examinations of the implant sites, the implanted prothesis and 15 to 18 body organs. Those materials implanted into dogs to date have elicited no adverse reactions or carcinogenic activity, (up to 45 months in-situ time).
Plaintiff's Exhibit 7.59.
    Mr. William Stith, the person in charge of MEC's Scientific Affairs Committee which looked into new materials and procedures to increase the biocompatibility of materials MEC used for medical implants, testified that he had reviewed thoroughly the dog studies. Deposition of Stith at 219 & 901-02. He admitted that no dog in the beagle study had material implanted for eighty-four months, and he had no other evidence that anyone did a seven-year dog study on the materials in the Surgitek mammary implants, whether they contained General Electric or Dow Corning components. Id. at 901-04.

[117] Deposition of Lynch at 1865.

[118] Id. at 2457; see also Defendant's Exhibits 744, 745, & 710.

advised by a scientist participating in the study that as to some beagles:

> All specimens exhibited an energy pulse in the region of silica. The <u>kidney and liver</u> appeared to have greater peaks than the other tissues though <u>thyroid</u> from CC74 also exhibited a significant peak.
> The data at this point suggest that there is a high suspicion of the presence of a silica containing compound in very low concentrations. It is recommended that more tissues be examined.[119]

Lynch interpreted this to mean silicon had been found in these organs which he felt could be in the organs of the beagles naturally.[120]

In October of 1978, Lynch confirmed to MEC the finding of

---

[119] Plaintiff's Exhibit 3.158(a). Lynch agreed these adverse findings were inconsistent with MEC's published statement that all biocompatibility testing of MEC's breast implant materials was universally negative and other statements contained in printed information which MEC provided its sales representatives to convince doctors to buy its implants. <u>See</u> Plaintiff's Exhibit 7.59; Deposition of Lynch at 1885 & 1891-95. For instance, the sales literature of MEC in 1974 stated that the implants had been tested in dogs for periods up to seven years with no adverse reaction when at that time no dog had been implanted for seven years and there had been adverse findings. Deposition of Lynch at 1896-98. Lynch agreed these statements were false at the time they were made. Further, there was no follow-up system of user response to provide data necessary to ongoing product safety programs and to assure users that Surgitek breast implants were safe for long-term use as stated in MEC's sales literature except for sporadic physician complaints and returns of implants by physicians to MEC. <u>Id</u>. at 1899-1900. No formalized follow-up system was put in place by MEC to determine adverse reactions in women implanted with MEC breast implants. <u>Id</u>. at 1901 & 2910-13; <u>see also</u> Plaintiff's Exhibits 7.92 & 7.43; Deposition of Lynch at 1908-16. Lynch testified he felt these written statements disseminated to physicians and others were exaggerations but that MEC still had a good, biocompatible product. Deposition of Lynch at 2528-31.

[120] Deposition of Lynch at 2454-81.

silicon in the tissue samples from selected organs of dogs CC74 and 450R in the study:

> Silicon in various inorganic forms occurs in animal tissues. Silicon may be functionally involved in certain biological functions such as calcification and mitosis.
> The microscopist's report, based on the tissues he examined, indicates the presence of low concentrations of silicon. It is difficult to draw any conclusions from his observations because of the lack of reliable data concerning organ and tissue distribution of silicon. . . .[121]

On July 17, 1979 Lynch sent MEC's president Sanders an interoffice memo stating that two dogs receiving long-term silicone implants showed low but definite concentrations of silicon in selected organs with highest concentrations of silicon being found in their kidney and liver tissues.[122] Lynch recommended that the dogs' tissues be examined by a Molecular Optics Laser Examiner ("MOLE"), which could differentiate between silicon compounds at a cost of not more than $850 to MEC.[123]   Instead, the dogs' tissues were destroyed, and the beagle study was abandoned by MEC in favor of conducting less expensive and shorter ninety-day rabbit studies.[124]

Consequently, it is not known how much gel bleed occurs

---

[121] Defendant's Exhibit 743.

[122] Defendant's Exhibit 704.

[123] Id.; Deposition of Lynch at 2482-94.

[124] See Plaintiff's Exhibit 3.146 at 6, dated March 28, 1978; Deposition of Lynch at 2494-2501; Defendant's Exhibits 710 & 738.

over the life of an implant[125] or the actual effect of such gel

bleed.[126]   MEC failed to conduct such tests, although Lynch

---

[125] Lynch testified that when he first designed the silicone gel breast implant and knew that it would have gel bleed, he also knew that calculations could be made for the time it took for the gel "lites" to permeate the shell, the permeation coefficient or rate of transport through a material. Deposition of Lynch at 2724-25. Dr. Blais estimated that the actual released material for the duration of the implant would be 20 to 40 grams of gel bleed (or 10 to 20 grams per implant), but since the actual fill weight of the implant and the amount of material being absorbed back into the implant from the body is not known, the actual amount of gel bleed is undetermined. He weighed Plaintiff's implants in his laboratory after explant and found the right implant weighed 254.5 grams and the left implant weighed 251.6 grams. These implants were made from a 255 gram mold and had a fill weight of 253 grams for the left implant and 257 grams for the right. However, since the manufacturing protocol allowed the insertion of a needle to withdraw lint and gel, there might be additions to the gel to extend the expiration date, and there was no specific entry on the lot histories for Plaintiff's implants, he testified that the true manufacture weight is not known. Dr. Zeigler disputed the amount of gel bleed to which Dr. Blais testified, stating that the amount of gel bleed from Plaintiff's implants likely not be as much as one gram based on the weight of the implants at fill as documented in the lot histories. However, Dr. Zeigler "made a conscious decision" not to weigh Plaintiff's explants, although he did weigh explants when he testified in other breast implant cases for Defendant. He explained that he did not weigh Plaintiff's implants because of "what was going on in vivo" and because he would be giving data that cannot be readily interpreted and might be misinterpreted. He offered the opinion that the maximum bleed from one implant would be four to five drops, or 0.25 grams. Dr. Zeigler theorized that the difference in weights of Plaintiff's implants noted by Dr. Blais and Dr. Puszkin was due to a difference their respective laboratories' balance calibrations.

[126] Dr. Shons's testimony that by the 1980s silicone gel breast implants had a history of being clinically safe does not appear to be supported by evidence of any appropriate testing.   Dr. McCarty, who has been an expert for Defendant BMS for several years, testified that he had reviewed MEC's documents and did not recall if tests on gel bleed or migration were reflected in such documents.   Although MEC established the Scientific Affairs Committee in 1977, Dr. McCarty admitted that he saw no MEC study characterizing what

60

himself noted the necessity for them and other experts testified that the standard for testing implantable devices at the time Plaintiff received her implants would require such tests.[127]

Betty Lock, MEC's manager of regulatory affairs from 1980 until 1986 when she became director of regulatory affairs responsible for the content of control documents, labels, and package inserts, testified that the beagle studies done by both laboratories had the same flaw because numerous materials were implanted in the dogs, making the study invalid as clinical research, and because the cause of the adverse

occurred at the surface of the implant, analyzing extractants in animal and human capsules, or analyzing injection of radio labeled gel bleed materials.

[127] For instance, Dr. Busch testified as to the "Van Winkler Rules," a guide for how a manufacturer should test drugs before putting them on the market, which was contained in an authoritative publication, "Rules for Drug Development and Toxicity," published in 1964. This advocated first testing for the safety and analysis of the efficacy of the product, then testing for the analysis of acute, sub-acute, and lifetime effects of the product. Under the Van Winkler Rules, a minimum of three primate animal studies for lifetime information on humans and one lifetime study should be done on any substance which will enter the body as a drug, such as silicone. These studies were not done by MEC. In 1985, the FDA did not require a new drug application for silicone gel breast implants which were treated as medical devices and not classified as drugs, and therefore, breast implants were regulated by the FDA as medical devices in a way different and distinct from drugs. There was no evidence presented to the Court as to when the FDA was apprised of gel bleed. Dr. Zeigler admitted that in 1971 and 1972 when MEC began marketing its silicone gel breast implants, the phenomenon of gel bleed was well-known, but he dismissed the significance of this by saying that silicone is in the body and everywhere, so there was no reason to think the product was not safe. On repeated questioning by Plaintiff's counsel, he conceded that this possibly could be an area of study.

61

reactions could not be determined.[128]  She noted that although low concentrations of silicon were found in the organs of certain dogs, no proper follow-up study was done by MEC.[129] Lock testified that MEC should have investigated the cause for silicone migration in the dogs' organs.  While she told the FDA about the study, she did not disclose the finding of low amounts of silicon in the distant organs of the dogs.  Instead she only advised the FDA that the dog study was not usable.[130] She admitted that the dog studies would not be reliable to show the safety of MEC's silicone gel breast implant, although that is what was represented by MEC on its package inserts for which she was responsible.[131]

The adverse findings from the shortened beagle study were

---

[128] Deposition of Lock at 106-107, 192, 214, & 1316.

[129] Id. at 106-107 & 1316.

[130] Id. at 1322.  Lock testified that she knew in 1982 that if premarket approval was required by the FDA, she would need such things as laboratory data, animal and clinical study data, device characteristics, performance standards, labeling, and a bibliography of significant articles in preparation for the premarket approval process in 1988.  Id. At 1674-81.  On February 2, 1983, she prepared for MEC her recapitulation of the FDA's panel meeting and comments of Dr. Mishra on the lack of valid scientific data to justify the safety and efficacy of the silicone gel breast implant.  Id. at 1760.  However, MEC did no animal testing in preparation for the premarket approval and only tested for physical properties of the silicone gel breast implant.  Although the FDA had requested all animal toxicity studies, Lock failed to reveal that low concentrations of silicon had been found in distant organs of the beagles.  Id. At 1322 & 1884.

[131] Id. at 1322 & 1429.

62

never disclosed in MEC's sales literature.[132]

_____

[132] Deposition of Lynch at 1916-17. Much testimony on the beagle study was presented at trial. In addition to Lynch's deposition, Dr. Williams testified that the MEC dog studies were intended to extend in time over seven to eight years the observation of tissue reaction in another, larger species, the beagle, with a longer lifetime than a rabbit. The same dog had several implant sites used and was implanted over a period of time using a number of different implant materials. While some of the dogs became sick, Dr. Williams testified this was determined to be from a well-known condition in the dogs, not from the implant, and on examination of the organs, the tissue reaction to the gel and shell was good. Dr. Williams stated that MEC used a General Electric material in most of the dogs, only later using a Dow Corning 515 and 517 gel and shell material in two dogs, Dogs 450R and 395R. He stated that the director of the world's premier testing organization today, Dr. Wallen of the North American Science Associates Incorporated ("NAMSA") which was conducting the tests for MEC, advised MEC to go back to use of rabbits to study long-term tissue response to biomaterials. Further, he stated that when the veterinarian, Dr. Patricia Teer, examined the dogs, she found local tissue reaction was good with little evidence of significant response. The only finding of significance was confined to the kidney which she attributed to naturally occurring disease and not to silicon. Dr. Williams stated that "this was consistent with my observations in similar cases." When questioned about Lynch's letter, Defendant's Exhibit 1277 and Plaintiff's Exhibit 3.151 dated October 23, 1978, describing the pathologist's histological report noting silicon present in the liver, kidney, thyroid, and lymph nodes using energy dispersive x-ray analysis, Dr. Williams testified that silicon is present in most animals in low levels, and EDAX cannot distinguish between silica and silicon. It can only tell if an element is present, not if it is a compound. He noted that when the last dog in the study, 395R, was sacrificed July 11, 1979, its tissue and organs were put into a fixative in containers and mailed to MEC. Lynch wrote to the president of MEC on July 17, 1979 that he wanted to see if dog 450R had silicon through the use of a Molecular Optical Laser Examiner ("MOLE"), but according to Dr. Williams, a MOLE could not be used because it was determined there was an insufficient level of silicon present. Dr. Williams opined that the research on dogs 450R and 395R was appropriate, and that there was no evidence of silicone migration to the organs or that the silicone gel breast implant was inappropriate for implant into humans. However, Dr. Williams admitted that MEC's representations that for up to seven years long-term implants in dogs were evaluated were not true as to dogs 450R and 395R, which were implanted in 1976-1977 and sacrificed in 1979. See

The testimony of William Stith, a manager of MEC's Life Sciences Department from December of 1977 until July of 1978 and the director of this department thereafter,[133] reveals the attitude of MEC on testing its breast implant product. Stith was in charge of product reliability, setting up the "Good Manufacturing Practice" ("GMP") required by the FDA effective December of 1978, and investigating and resolving

---

Plaintiff's Exhibit 7.92. Dr. Williams further admitted that he had read Lynch's statement on deposition that the dog studies were worthless, but Dr. Williams maintained steadfastly that they were valuable to show biocompatibility.

Dr. Harris Busch, who was qualified as an expert in pharmacology as it relates to the immunology of drugs, including the testing and warnings as to drug usage, reflected that despite MEC's claim in its literature dispensed to physicians and others that 15 to 18 organs of dogs were tested for 7 years, not a single dog was studied for 7 years and not one dog had 15 to 18 organs reviewed. From his review of the documents, the dogs in the beagle study had similar toxicity and inflammatory reaction, fibrous tissue formation, and tissue destruction which Dr. Busch opined occurred in women who had received MEC's silicone gel breast implants. Lynch also stated that both laboratories working on this beagle study, Wedge Creek Research and Cape Laboratories (owned in part by Lynch), had found these changes in the beagles. However, since up to eight different materials had been injected into the same dog, it was not a valid experiment, and the results could not be interpreted. Reviewing Plaintiff's Exhibits 3.145, 3.146, and 3.151, Dr. Busch opined that silicone was found distributed widely in the tissues, liver, and kidneys of dog 450R, and that what had been found was silicone, not silicon, a free element of silicone, as had been identified by the pathologist, Dr. Mora. According to Dr. Busch, it is not possible from the test results to determine whether what was found was silicon, silica (which is silicon combined with oxygen molecule groups), or silicone. Dr. Busch stated that the test results indicated that whatever was found was part of a complex compound which would require that further tests be done, not necessarily the state of the art test advocated by Lynch in his report of July 17, 1979. Plaintiff's Exhibit 3.157. However, no further tests were done by MEC.

[133] Deposition of Stith at 87-91.

problems in biocompatibility testing of implant device components.[134] He testified that his goal was not to be sure that implants did not cause abnormalities in the organs of women who were implanted. Further, he felt there was no indication that it would be necessary for MEC to institute biocompatibility testing for this, and he did not feel that this was important.[135] He testified that he felt the ninety-day rabbit studies were long-term implant studies and that his goal was to look at the biocompatibility of the product in conjunction with the tissue at the implant site.[136] If there was migration of silicone gel from the implant to other body parts, he did not necessarily want to determine this.[137] He did not implement any long-term study of the effect of implants on women and does not know if MEC ever implemented one.[138] He expected doctors using the product to keep track of the results.[139] Referring to a document which he stated lists the MEC tests done by July 20, 1977 on the Dow Corning 515, 517, and 518 components of the silicone gel breast implant manufactured by MEC, Stith testified that except for the beagle study, the document reflects that the longest implant

---

[134] Id. at 87-88 & 90-104.

[135] Id. at 119-22.

[136] Id. at 130-48.

[137] Id. at 148.

[138] Id. at 157-58.

[139] Id.

65

study done on the Dow Corning 515 silicone gel was a seven-day implant test and that, further, no ninety-day implant with histopathology was done on the implant gel or shell.[140]   No other implant studies were implemented after this date except for two implant studies he directed on new materials, the seven-day test and the ninety-day test.[141]   Stith stated that instead of conducting tests on the long-term effect of such product, including gel bleed, he felt MEC could rely on the U.S. Pharmacopeia testing requirements for an implantable medical device made of polydimethylsiloxane designed for lifetime use, as well as a few other tests designed for drugs being placed in plastic containers.[142]

Stith's testimony was reinforced by Gary A. Golwitzer, a manufacturing engineer with Surgitek and BMS beginning in 1982 until he became a full engineer in 1986.  Golwitzer testified that part of his job duties included dealing with the FDA's concerns incident to the premarket approval and that, although he knew of gel bleed from the beginning of his employment, he believed a reasonably prudent manufacturer would find out about the constituents of gel bleed before selling the product.  He was responsible, along with others, for designing and implementing tests on the implant product.   No

---

[140] Id. at 189-94; Plaintiff's Exhibit 3.389.

[141] Deposition of Stith, at 808-16; Plaintiff's Exhibit 4.18.

[142] Deposition of Stith at 827-28 & 855.

66

investigation or testing of gel bleed was done by his employer to his knowledge except for a ten-minute massage test, a dry bleed test which he described as worthless, a filter paper test, a test for permeability in one direction, and an aqueous test.[143]

Thus, not only were the standard clinical trials not done on the silicone gel breast implants, other than short-term animal studies and the abandoned, yet inconclusive and alarming beagle study, but also MEC undertook no effort to gather clinical data or to study users of its breast implants over a period of years on a regular basis by keeping a patient registry.

In the chapter on testing in his 1976 book published eight years before Plaintiff received her implants, Lynch advocated clinical trials on humans to complete the series of tests necessary for implantable products in humans.[144] This was not done by MEC at any time with regard to its breast implants. Under standards for testing materials to be used in

---

[143] Deposition of Golwitzer at 30-36, 70-73, 178, 182, & 192-199. Golwitzer testified that Plaintiff's Exhibit 2.247 is a summary of the analysis done on gel bleed studies. <u>Id</u>. at 216.

[144] A clinical trial is a formal procedure in which the medical device to be tested is used in a controlled population of patients with the physicians attending the patients filling out forms describing the human experience and sending the forms to the manufacturer. Deposition of Lynch at 1902-04. Lynch stated that if several years after implant a woman had a tissue reaction showing inflammation, or a foreign body reaction with foamy histocytes and giant cell reaction, it would indicate the implant was not biocompatible with the host. <u>Id</u>. at 1709-11. This reaction occurred in Plaintiff.

the human body, Lynch described in his book three safety tests
of such materials which should be done:

> (1)   Short-term acute animal testing (less than seven
> days);
>
> (2)   Long-term animal testing; and
>
> (3)   Limited clinical trials in human beings.[145]

Lynch admitted that MEC did not follow these steps which he
described for safety testing of implants sold by the company
for humans.[146]

Lynch stated that it was his opinion that silicone gel
breast implants would eventually wear out.[147]  Toward the late
1970s, MEC began receiving reports that its implants were
wearing out, which in some cases involved trauma.[148]  In 1975,

---

[145] _Id_. at 1905-1906.  Lynch wrote "It is not uncommon
that design changes are found necessary during this stage of
testing."  Lynch later testified he described this testing for
"prospective" material, meaning new material, which silicone
was not.  _Id_. at 2443-2445.  However, he admitted that
silicone gel breast implants were the first long-term medical
device which combined the use of silicone elastomer with
silicone gel.  Further, not only was the use of this
combination of materials new, but also MEC knew the
combination resulted in the silicone shell being permeated by
the silicone gel.  _Id_. at 2571.  After MEC stopped using
General Electric XD copolymer in its breast implant shells,
Lynch stated that all silicone breast implant shells MEC
produced and used with silicone gel were permeable and bled
uncross-linked molecules.  _Id_. at 2571-2572.

[146] _Id_. at 1906 & 2517-23.  Lynch testified that MEC did
not do long-term animal tests and clinical tests in humans
because MEC did a variety of tests with excellent results and
silicone was not a new material.  _Id_. at 2443-45.

[147] _Id_. at 2063.

[148] _Id_. at 2065.

AO 72A
(Rev.8/82)

Lynch established a protocol at MEC to investigate the issue of shell fatigue and learned that such fatigue was basically connected to the fold in the breast implant shell and the motion of the fold.[149] Lynch stated:

> I don't think anybody in the business at that time, including surgeons, fully realized the amount of motion of a breast, you know, during the course of a day, walking and jumping and dancing and that sort of thing.[150]

Lynch admitted that motion of the breast could affect gel bleed. Nevertheless, MEC conducted no tests to determine the

---

[149] Id. at 2066. In a letter dated April 23, 1980, Lynch wrote as a consultant to MEC:

Any mammary prosthesis should be handled with great care because the shell material, although it is strong and stretchy, has low tear strength and once it is nicked or scratched or subjected to unusual strain while forcing through a small incision, can easily split at the time of surgery or later during a patient's hyperactivity or an impact to the breast. This would be the case whether, within the acceptable range of thickness of mammary shells, the shell is thick or thin. On the other hand since the shell will have folds in it after the device has been placed in the patient and continuous flexing will take place at these folds due to the activity of the patient, we feel the thinner shells have a twofold advantage; there is less chance of palpating the folds and the flex life should be longer because the thicker the material the higher the stress at the fold.

Plaintiff's Exhibit 8.42.

[150] Deposition of Lynch at 2066. According to Dr. Zeigler, MEC did tests to establish when gel bleed reached equilibrium and found the time was two to three days in an undisturbed implant. MEC's technical study in 1980 on mastication measured the effect of handling on the properties of silicone gel. It was not a study to determine the effect on the implant when there is movement in the human body. See Plaintiff's Exhibits 2.84, 5.48, & 5.73.

effect of breast motion on its implants in the human body.[151] Lynch admitted that he did not know if MEC's sales representatives told doctors that the implants would last the lifetime of the patient and stated that this statement, if made, would be a misrepresentation.[152]

Lynch testified that MEC did not fund a study to look at the immune response of women implanted with its breast device. At least one MEC employee responsible for conducting and carrying out tests on implants testified that there was discussion within Defendant of claims that women were getting ill from silicone implants and the possibility that implants caused autoimmune disease.[153] However, no tests were conducted by MEC to determine if there was an association between gel bleed and autoimmune disease on the ground that there was too little incidence of such disease to justify a test.[154] Such study, Lynch noted, would require thousands of patients and would have to have enough people involved to make a statistical determination of whether the immune system is affected by silicone gel bleed.[155] In his opinion this would require two populations, one with silicone gel breast implants

---

[151] Deposition of Lynch at 2067-69.

[152] Id. at 2070-72.

[153] Deposition of Golwitzer at 46-47.

[154] Id. at 47. Mr. Golwitzer stated that there was no way Defendant could set up such a test, and he did not know of anyone who contacted an expert to do such test. Id.

[155] See supra note 99.

70

and one without such devices. No testing of this nature was done in animals because, according to Lynch, MEC felt it would not be able to find an exact animal substitute for the human.

Dr. Kenneth Scott McCarty, Jr.[156] testified that in 1991, when silicone gel breast implants were removed from the market, immuno-potential tests had not been done. The 1991 application for approval to market a silicone gel breast implant made by MEC to the FDA was rejected for lack of proof of safety. MEC had opposed reclassification of silicone gel breast implant devices from a Class II to a Class III device which would require premarket approval by the FDA.[157] Over the objection of manufacturers, including MEC, the FDA did reclassify these devices and, in 1991, identified potential

---

[156] Dr. McCarty, who testified as an expert in pathology and internal medicine with emphasis on endocrinology, is a board certified anatomic pathologist and specialist in internal medicine. His curriculum vitae is Defendant's Exhibit 1149. Dr. McCarty testified that he has examined 15,000 pathology slides on breasts, over 1800 of which were slides of women with implants and about 400 of which involved specimens from breast capsules of women with breast implants. Dr. McCarty has worked for several manufacturers of breast implants, beginning in the 1980s, and has acted as an expert for Defendant BMS since the early 1990s. He has reviewed approximately 30 cases, including review of pathology slides in at least 10 cases involving silicone gel breast implant litigation. Dr. McCarty was vague concerning the circumstances and amount of money he has earned as an expert in this regard. He has neither written a peer-reviewed article nor spoken to scientific groups on silicone gel breast implants.

[157] Dr. Blais testified that the idea of premarket approval had been developed first in the United States, before Canada considered the proposition, but that the "landscape" in the United States was much more complicated. It was not until 1992 that breast implants came under regulation by the FDA similar to that in Canada, with important exceptions.

risks for MEC to address before approval to market them would be granted.[158] The FDA then determined that there was insufficient documentation provided by MEC and withheld approval of the devices for sale except in limited circumstances, such as for breast reconstruction following mastectomy.[159]

### C. EFFECTS OF MEC'S IMPLANTED SILICONE GEL BREAST DEVICE

Preliminarily, the Court notes that both Plaintiff and Defendant offered testimony at trial from a variety of experts on the issue of the effects of the silicone gel breast implant on the human host. These witnesses can generally be divided into two categories: (1) those who have spent considerable time and attention directed in particular to the study of

---

[158] In his testimony on this subject, Dr. Williams referred to Plaintiff's Exhibit 9.104. According to Dr. Williams, the FDA asked MEC, among other things, for molecular weight distribution of gel precursors and an analysis of volatile and nonvolatile residual compounds. He did not see compliance with this request within MEC's documents.

[159] In the opinion of Dr. Williams, there was adequate documentation that the silicone gel breast implant was safe and biocompatible, and there was adequate safety information to evaluate the risk of autoimmune response at the time the FDA refused to grant premarket approval. This opinion was given by Dr. Williams at trial, although he conceded that MEC and other manufacturers of silicone gel breast implants made no attempt to follow, in a controlled, clinical manner, women who had received implants to determine if there was an adverse immune response. He stated that he was not aware of any funding by MEC or BMS of an epidemiological study of this issue whether before or after the 1991 premarket approval was denied. MEC simply responded individually to physicians who contacted MEC and undertook neither to follow-up with implanted women nor to send a "Dear Doctor" letter to apprise physicians of the possibility of an autoimmune response to its device.

silicone gel breast implants and the long-term effects of such implants on women, and (2) those who were experts in related fields but who had been retained for this case to review documents and utilize their considerable credentials to render opinions by extrapolation from their respective areas of expertise. The large fees paid to these experts, the length of time many have remained engaged as an expert solely for one side or the other in lawsuits involving silicone gel breast implants, the degree to which some of these witnesses have been subjected to "investigation" by representatives of the opposing party, with resulting loss of position, stature, and/or income,[160] and the passionate involvement in the issues in this case some demonstrated from the witness stand makes this case unusual when compared with other trials involving issues of science. It has caused the Court serious question concerning the scientific objectivity and reliability of some of the testimony presented.[161]

### 1. Gel Bleed

It is undisputed that the design of the silicone gel breast implant produced by MEC resulted in gel bleed. It is a play on words to contend that gel bleed was not an

---

[160] Reference is made in this regard to the testimony of Drs. Blais, Puszkin, and Campbell.

[161] However, in some respects, the testimony of these witnesses on particular scientific matters was not contradictory and, thus, to that extent credibility was not involved. For instance, the testimony of Lynch and Dr. Blais as to gel bleed and gel migration was surprisingly similar.

"intended" result of the design of this product and the component materials used, although much testimony was presented on this point.[162]   Virtually all of the knowledgeable experts testified that a silicone-based elastomer containing a silicone gel in a breast implant device would "bleed" by virtue of the chemistry of the shell and gel in juxtaposition

---

[162] For instance, Dr. Alan Shons, an expert in plastic surgery, testified that the silicone gel breast implant "as originally designed was not designed to bleed."   This testimony was given without any indication of direct knowledge of this witness of either the manufacturing process or materials science. To the same effect is the testimony of Dorothy Povkovich, employed by MEC variously as a regulatory affairs analyst, document writer, and supervisor since April of 1978.   Deposition of Povkovich at 12-13 & 136-39.   While there was no testimony that the originator of this device wanted an implant that would bleed silicone gel, there is no question, as Mr. Lynch himself testified, that he and the Defendant manufacturer knew at the time the silicone gel breast implant was designed and manufactured, as well as at all times when the device was placed for sale in the market, that the implant would bleed gel by virtue of the properties of its component parts. Lynch testified that while he did not have the goal of designing the shell of the MEC breast implant to bleed gel, or the goal of designing it to fail because it would allow the gel material to escape, he knew the silicone gel from the implant would bleed through the shell because of the design he chose and the components used by MEC to make the device.   Deposition of Lynch at 2721 & 2730. To like effect was the testimony of Dr. Williams who stated that while gel bleed was well known to MEC, the implants were not designed in order for them to bleed; the concept was to design the implant to give it shape by the shell, not to contain the gel.   On cross-examination, Dr. Williams admitted that he had not looked at the properties of the ingredients in the Dow Corning gel used by MEC and, further, that materials which are satisfactory for use by themselves may be unsatisfactory when used in combination with other materials in a medical device. On the other hand, Dr. Zeigler noted that by selection of the materials used in Plaintiff's implants, MEC incorporated into the design the factor that the elastomer would be permeable to other silicones.

74

to each other.[163]   As described previously, because of the

properties of the silicone gel and the silicone elastomer in

relation to each other, lower molecular weight molecules of

the gel are attracted to the higher weight molecules of the

elastomer, causing the oils in the gel to migrate through the

elastomer shell in a phenomenon generally referred to as "gel

bleed."[164]   This causes the shell to swell as the oil passes

through it to the outside of the silicone elastomer resting

against the human breast tissue.   The swelling of the

elastomer in turn causes the gel bleed to increase.[165]   In

---

[163] As noted previously, Lynch, founder of MEC and designer of the breast implants which it sold, described this phenomenon during his deposition.  Dr. Zeigler testified that if a soft material breast implant is desired, there is no way to incorporate a soft material, including silicone, and not get fluid permeation.  Dr. Blais and Lynch disagreed.  MEC developed SCL "A," a silicone gel breast implant that was marketed by MEC as having less gel bleed, at the time Plaintiff received her implants.   MEC also developed and marketed a saline-filled breast implant.

[164] Dr. Blais testified that gel bleed is a vernacular term for what is more properly described as leakage of the gel.  Dr. Christopher David Batich, who received his doctorate in organic chemistry at Rutgers University and who qualified as an expert in material science and chemistry with emphasis on silicone chemistry, gave a simplified explanation of gel bleed of low weight molecules of the silicone gel through the silicone elastomer which he said is more properly described as permeation, osmosis, or diffusion.

[165] Dr. Blais explained how the additives to the manufacturing process affect the bleed of the gel.   For instance, he noted, the zinc stearate added to remove the shell from the mold is a wax mixed with a paint-like solution which is washed away when the shell is removed from the mold, leaving holes in the shell which in turn increase the amount of gel bleed.   He contended that the bleed also carries with it metals from the catalysts used in the manufacturing process which then penetrate the shell to its outer side.  While describing gel bleed as permeation, or the movement of

AO 72A
(Rev.8/82)

addition, mastication or massage of the implant, or movement

of a breast containing a silicone gel implant, can increase

gel bleed.[166] As to gel bleed, Dr. Blais testified that as the

molecules of low weight through the implant membrane under the
influence of the concentration gradient, whereby more
molecules remain inside the membrane than outside of it, Dr.
Zeigler disputed that chemicals added in the manufacturing
process had any affect on gel bleed.  Instead, he stated that
gel bleed occurs because of spaces in the elastomer and
because there is more of the permeating material inside the
elastomer than outside of it.

[166] Much testimony was produced on this point.  Gary A.
Golwitzer, an MEC employee responsible for testing, testified
that MEC knew gel bleed caused the elastomer to become softer
and that MEC had found that the cohesion of the gel changed
with manipulation during a ten-minute massage test.  No other
manipulation tests were done by MEC.  Deposition of Golwitzer
at 40-41. Several witnesses, including Lynch, Dr. Zeigler, and
Dr. Blais, discussed the concept of equilibrium of gel bleed.
Dr. Blais testified that if the silicone gel breast implant
was left undisturbed for a period of time, around 15 days, the
gel bleed would equalize and stop.  Dr. Zeigler testified that
MEC tests showed equilibrium, or the point at which gel bleed
will cease coming through the shell, was reached in 2 to 3
days.  However, in the body, this condition is not achieved
because of movement of the human which affects the breast.
Dr. Batich conducted a test in which a silicone gel breast
implant was put into a container of simulated body fluids
consisting of salts and water and was subjected to a gentle
rocking motion.  He found that at first there were different
levels of gel bleed, and then the bleed settled down to .7 mg.
every 2 weeks or about 18.2 mg. per year and .05 mg. per day,
an amount he felt was significant, particularly since he found
that gel bleed was continuous.  Further, Dr. Blais testified
to a mastication technical study done in 1980 which reflected
that silicone gel, if moved, lost its properties and quickly
produced oils.  Plaintiff's Exhibit 2.84.  If the handling
ceased, some but not all of the gel restored its properties.
Dr. Blais left one of Plaintiff's implants on the top of the
laminated witness stand during his testimony, and upon its
removal, a residue was clearly visible.  He testified that
simply leaving the silicone shell on a surface and waiting for
it to bleed is not honest to the human situation.  When
questioned whether massage caused gel to lose cohesivity in an
implant, Dr. Shons stated that he did not know what cohesivity
meant.  Dr. Zeigler was critical of the experiment related by
Dr. Batich, stating that Dr. Batich's attempt to show

76

oil component of the gel carrying impurities bleeds, its composition changes as does the composition of the silicone gel left inside the silicone shell. Further, since many parts of the human body are attracted to oil, the shell with oil in it attracts fatty substances from the body which can be

---

degradation of the surface of the elastomer was flawed because he used an elastomer that was different from that used in a breast implant, treated the elastomer with strong oxidizing reagents which are not found in the human body in significant quantity, and failed to show that hydrolysis had occurred. Dr. Zeigler opined that not only does the published literature not support the position that the silicone elastomer degrades at the surface and the silicone molecules become water-loving, but also he stated that pressing on an implant would cause only a small increase in gel bleed which is not measurable, does not change the viscosity or thickness of the gel, but does change the cohesion or ability of the gel to stay together in a single mass. He also acknowledged that MEC's mastication tests showed a change in the gel cohesion, and to the extent material is removed from the surface of the elastomer, it would be replaced by gel from the interior, upsetting the equilibrium. Dr. Zeigler was critical of agitation tests which showed "steady state bleed" because the tests were conducted on a roll mill which constantly removed material from the surface of the elastomer and did not replicate the body condition. Dr. Zeigler was also critical of the filter paper test used to demonstrate gel bleed on the ground that equilibrium would not occur because the filter paper is like a wick, removing the gel material, and the situation was not indicative of what happens in the body because it was not in an aqueous environment. Nonetheless, he admitted that a closed capsulotomy or excessive handling of the implant caused reduction in gel cohesion, although this is not irreversible since cross-linking recurs if the implant is allowed to rest about 14 days.

Dr. McCarty was also critical of the filter paper tests on the ground that filter paper acted like a wick. He opined that closed capsulotomies did not increase gel bleed because they do not involve persistent enough pressure, although he admitted that he and his colleagues had never performed such technique. Dr. Williams testified that he had seen MEC documents showing that silicone gel did break down from handling or massage, but he was uncertain if MEC equated handling with massage. Dr. Williams did concede that whether a material breaks down in the body is important to its use because the body is a harsh environment.

device, the silicone gel breast implant manufactured by MEC acted as a slow delivery system of silicone gel when placed in the human body.

## 2.  The Foreign Body Reaction

After an implant is surgically inserted into the human body, a response known as a "foreign body reaction," a response of tissues to a foreign body, occurs.[171]

---

Plaintiff denied that she was a person of low activity during the major portion of the time during which she was implanted. The Court does not include these as defects in its findings of fact, either because they were not supported by the evidence, such as violent imprint of the patch, or they are irrelevant to the Plaintiff's claims.

[171] Several witnesses discussed the foreign body reaction and this phenomenon in the context of an implanted silicone gel breast device.  For instance, Dr. McCarty, stated this is a process whereby a monocycle enters into the tissue from the blood circulation and becomes a histiocyte, or tissue monocyte or macrophage, which develops vacuoles, or a membrane delimited space within the cell, to contain the debris of anything foreign which it is trying to clear from the body. If the foreign body is something which the macrophage cannot digest, several macrophage cells can fuse, forming multi-nucleated cells which have a foamy appearance and also are sometimes called foreign body giant cells.  Together the foreign body giant cell, other histiocytes, and macrophages will stimulate fiberblast cells that deposit collagen and store whatever cannot be eaten, consumed, or recycled, forming the capsule.  If fusion does not occur, the cells are often referred to as foamy histiocytes.  Dr. Williams noted that the acute inflammatory response which occurs with any implant is the initial stage of the foreign body response.  Dr. Kotzin further described how the arms of the immune system have the capability to recognize and discriminate between foreign bodies and the normal cells of the human body.  He related that the body's T-cells help its B-cells by attacking cells with the foreign body, such as a virus, to try to remove them from the body.  The T-cell has a receptor which can reach out and recognize foreign matter chopped up in a presenting cell or macrophage.  The B-cells make antibodies, soluble proteins which travel throughout the body to target whatever is to be recognized, such as tetanus.  To have a good antibody response, the B-cell needs help from the T-cell to make

AO 72A
(Rev.8/82)

absorbed into the shell and migrate into the gel still held within the elastomer.[167]

While gel bleed was not a desired result or a goal of the design of MEC's silicone gel breast implant, it was well-known at the time such breast implant was designed and sold to physicians, as Lynch testified that silicone gel placed inside the silicone elastomer shell resulted in the phenomenon of gel bleed in all such breast implants.[168] Further, Dr. Brian Kotzin[169] testified that he was not familiar with any

---

[167] Dr. Blais called this the "partition equation" or an exchange. Dr. Batich concurred that body fluids permeate inside the elastomer shell and the gel it contains. Dr. Puszkin also testified that not only do silicone gel implants bleed, but also the body contributes molecules to the gel inside the shell. Since the body creates negative and positive pressure on the chest, things go in and out of the elastomer in the chest, Dr. Puszkin explained. Further, if the elastomer shell is put on a desk, barometric pressure can cause gel bleed. Dr. Zeigler testified that atmospheric pressure affects only slightly the rate of equilibrium but not the amount of gel bleed in reaching equilibrium.

[168] See also Plaintiff's Exhibits 3.273, 3.220, & 3.248. There was testimony from Lynch and Dr. Blais that breast implants could have been designed at the relevant time without gel bleed occurring, for instance with the use of a saline solution instead of silicone gel as the filler within the elastomer. Lynch testified that the first implant he designed used a material that did not bleed. Dr. Blais testified that a gel could have been made that would not change. According to Blais, at the time Plaintiff was implanted in 1985, MEC had begun selling the SCL "A" (strong cohesive low-bleed series) breast implant, consisting of a shell with an extra coating of a different material to seal holes and to lessen gel bleed. Dr. Williams, in contrast, stated that it is not possible to create in a breast implant a sufficiently flexible membrane which is totally resistant to diffusion.

[169] Dr. Kotzin is a practicing physician in rheumatology and internal medicine, a professor, patent holder, and an acclaimed researcher who with others has published over 125 peer-reviewed papers focusing on how people develop connective

biological mechanism by which a person exposed to gel bleed

could eliminate such exposure from her body and, further, that

such bleed would continue, not necessarily at the same rate,

for the entire time the silicone gel implant was in the

woman's body.[170]   Thus, as noted during an FDA hearing on the

_____

tissue disease and the genetic predisposition and immunologic
means by which autoimmune disease is developed.   Dr. Kotzin's
curriculum vitae is Defendant's Exhibit 1146. He was qualified
as an expert witness in internal medicine, rheumatology, and
immunology. Although Dr. Kotzin has not previously testified
in a silicone gel breast implant case, he has been designated
as an expert witness by BMS in approximately 30 cases since
1996.   He has earned approximately $80,000 a year for each
year, 1996 and 1997, for his work for BMS.   He has not
published or presented a paper or lecture to a scientific
group on silicone gel breast implants or related disease(s).
Excluding referrals from breast implant manufacturers, only 15
to 20 of his patients have silicone gel breast implants. He
also testified that neither his research nor his laboratory
dealt with silicone polymers.

[170] According to Dr. Blais, the Surgitek 1500 type
implants placed in Plaintiff were manufactured by MEC in the
mid-1980s and contained other defects in addition to gel
bleed.   For instance, the shells were full of microscopic
holes which were large in relation to the silicone oil and
furthered the gel bleed process.   The shells had too much
surface area, causing the shell of the implant to fold back on
itself, primarily around the implant rim and the implant
patch.   The folds repeated in the same place, causing a
buckling. Dr. Blais found 10 different pleats or folds on the
rims of Plaintiff's implants, with more severe pleats being
found on her left implant. He found the gel in one implant to
be more fluid than the gel in the other and testified that the
imprinting of the patch had caused the elastomer material to
stretch and deform, thus opening up microscopic holes for gel
bleed to occur against Plaintiff's nipple.   Dr. Blais
described Plaintiff's implants as being "glossy," or showing
a significant rate of oil effusion readily visible to the
naked eye.   He noted that the implants were not matched, a
factor which does not appear to have relevance to the claims
in this case as he stated they were of the same size and
issued from the same mold.   He also stated that there was a
long delay between the manufacture and the implant of the
devices into Plaintiff and that the shells were worn in a way
"typical of the age and low activity" of the Plaintiff.

79

This is an acute inflammatory response achieved through different cells, predominately macrophagia, which try to consume the invader, and, if unsuccessful, will wall out and store the foreign body or cause it to be pushed out if it is close to the skin. When a silicone gel breast implant is put into the human body, a tissue, called a capsule, is formed as part of the foreign body reaction.[172]

---

antibodies. Both are necessary. If the body does not have a good antibody response, it will develop infection or other problems. Dr. Kotzin explained that there is no scientifically valid study to show that T-cells can recognize silicone in anyone. Therefore, he testified, the symptoms of women with silicone gel breast implants are unrelated to T-cell immunological responsibilities or an antibody related immune response. Further, silicone consumed by a macrophage, the presenting cell, cannot be chopped up and presented for the T-cell to bind to it. According to Dr. Kotzin, it is chemically unlikely that this would happen, and there is no evidence that T-cells go to the area of the breast implant because they recognize anything. He also represented that there is no reliable evidence that T-cells proliferate in response to silicone products. He dismissed as unsupported the contention that an autoimmune response involving T-cells and B-cells occurs in women with silicone gel breast implants, stating that no study shows this to occur and the theory does not take into account the way a T-cell recognizes a protein. Furthermore, if this occurred, he stated it should be identified as occurring in the capsule, but no study shows this to have happened.

[172] During trial this tissue was referred to variously as "the capsule" or "scar tissue" or "capsular contracture." Dr. Puszkin called it a "pseudo-capsule," a new organ of connective tissue formed in an attempt of the body to isolate the elastomer shell from the living body tissues. He described this capsule as the first wall of defense on the part of the body to the silicone gel which is bleeding from the shell of the implant. Dr. Puszkin stated that the capsule which forms around the breast implant is full of blood vessels, tissue, and nerve endings. Thus, he stated, it is a living tissue, not a scar tissue as some have described it. Dr. Shons also testified that the scar capsule was a live tissue with blood vessels. However, Dr. McCarty disagreed on this point, as he did with much of the testimony of Dr.

AO 72A
(Rev.8/82)

While, any substance implanted into the body causes a foreign body reaction, different types of implanted materials cause different foreign body responses. The foreign body reaction can be researched according to the material implanted. Dr. Williams stated that there is no material that can be implanted with assurance that no capsule will form.

However, according to Dr. Harris Busch,[173] when breast implants were first put into the human body, the type of foreign body reaction that ensued was not expected and was an astonishment to the manufacturers.[174] Dr. Saul Puszkin[175]

---

Puszkin. Dr. McCarty testified that any implant will cause a foreign body reaction and that the capsule around a silicone gel breast implant is not a pseudo-capsule, a term which he stated has a specific meaning in pathology to designate a rapid growth tumor which is usually benign. Instead, Dr. McCarty described the capsule as a delimiting, fibrous membrane formed through the deposit of collagen consisting of a fine, delicate, connective tissue which compresses to form a capsule-like surrounding, a true capsule, when a foreign body is present.

[173] Dr. Busch was qualified as an expert in pharmacology as it relates to the immunology of drugs, including the testing and warnings as to drug usage. He has had a distinguished career as Chairman of the Department of Pharmacology at Baylor College of Medicine, President of the American Association for Cancer Research, and author of 939 peer-reviewed publications, including 36 textbooks, among other accomplishments. See Plaintiff's Exhibit 1.39. He has also acted as a consultant for defendant breast implant manufacturers as well as for individual plaintiffs in breast implant litigation. He has not had direct experience in the manufacture of medical devices, has not been involved in research on the effects of silicone in the human body, and does not have a specialized background in silicone chemistry.

[174] Dr. Busch, an expert testifying for Plaintiff, stated that the first definitive work published on capsular contracture appeared in 1981, although there were earlier published reports, and stated that capsular contracture occurs in up to 90% of patients receiving breast implants. Dr.

82

pointed out that the foreign body reaction to other implants, such as pacemakers or solid silicone implants, is a scar tissue containing just fibers and no blood cells or foreign bodies, because no silicone gel is emerging. He found that the pseudo-capsule surrounding the silicone gel breast implant is not typical to the body's foreign body response because it is a "metaplastic" membrane with its own living blood vessels and cells and is representative of a constellation of responses to silicone gel which he has seen elsewhere in the body.[176] Because the silicone gel continuously bleeds outside

Shons, testifying for Defendant, stated that capsular contracture is known to occur in up to 80% of silicone gel breast implant patients, with wide variations which may cause deformity necessitating reoperation or removal. Dr. Zeigler, a materials expert, testified that the scar forming around the implant forces the implant into a shape more of a sphere as capsular contracture proceeds and folds in the implant occur. Dr. McCarty testified that the capsule inevitably forms around a breast implant, as well as around other types of implants, although he testified on cross-examination that the capsules formed can be different in two breasts of the same person and they can form immediately or be delayed for years in the separate breasts of the same person.

[175] Dr. Puszkin testified as an expert in biochemistry, pathology with emphasis on immune-pathology, and neurobiology. His curriculum vitae is Plaintiff's Exhibit 1.34. He holds a doctorate in biochemistry and has done research for many years in the areas of pathology, toxicology, and immunology. He was extensively cross-examined about the circumstances surrounding his departure to Columbia University from a tenured teaching position he held at Mt. Sinai for over twenty years and allegations of misrepresentation of research and his advanced degrees.

[176] Additionally on this issue, Dr. Gary Solomon, a practicing rheumatologist who is board certified in internal medicine and rheumatology, testified that the capsule which forms in response to a silicone gel breast implant is not a nonspecific response to any implant or intrusion, similar to the body's reaction to a splinter; instead, the tissue around

its elastomer shell, the body is not allowed to cease its foreign body reaction, which then becomes a chronic condition. According to Dr. Puszkin, a foreign body reaction can consist of inflammation and infection.[177]

Dr. Busch testified to the problems encountered when liquid silicone was actually injected into the human body. He stated that such direct injection produced significant harmful local effects; it produced scar formation, ulcerations, invasion by various kinds of white cells, distortions of the structure, bleeding, and the development of inflammatory masses called siliconomas or masses of inflammatory tissue, blood vessels, and white cells in the breast.[178] According to

a silicone gel breast implant has many layers, caused by the interaction between the immune system and the foreign invader, leading to an ongoing, specific immune response. Dr. Williams noted that the human body is designed to react to an implant, and the inflammatory reaction is a natural response to all implant situations of all materials, which then proceeds to a period of tissue repair with a fibrous material formed around the implant. In contrast to Dr. Puszkin and Dr. Solomon, Dr. Williams stated that the capsule, a layer or zone of fibrous material consisting primarily of collagen forming around the implant, is structurally the same for a breast implant and for a pacemaker.

[177] As noted later in this opinion, Dr. Puszkin testified that silicone gel had migrated away from Plaintiff's breast implants and into tissue in her breast area. From his examination of slides from Plaintiff's explant, Dr. Puszkin testified further that Plaintiff's tissues reacted to the silicone gel as a foreign material and became inflamed, a condition which is chronic when the silicone continues to leak into the area.

[178] Dr. Busch testified that inflammation is a redness or increased area of warmth or heat due to increased blood of the cell invasion. He also testified that a granuloma is a mass composed of capillaries, white cells, inflammatory cells, and giant cells that can be painful and interfere with a person's

Dr. Busch, when MEC did ninety-day studies of the Dow Corning breast implant product components, it found that inflammatory reactions developed around the implants of the type similar to those that had been found when various kinds of silicone had been directly injected into the breast.

Dr. Blais, Dr. Puszkin, Dr. Batich, and Dr. Busch testified that the silicone gel breast implant is not an inert device,[179] that the implant will reshape its environment, the

---

normal functioning. According to Dr. Busch, siliconomas are granulomas which contain significant amounts of silicone.

While first agreeing that the formation of granuloma is a form of biologic reaction, Dr. McCarty contended that granulomas do not form in response to silicone, although silicone may be associated with granulomas without always producing a granuloma, and he drew a distinction between giant cell reaction, a granuloma, and a macrophage reaction. Later he testified that "granuloma" is a term reserved for a granulomatous response and the formation of a nodular mass, and there are immunogenic granulomatous responses and non-immunogenic granulomatous responses, or foreign body responses, as well as specific and nonspecific inflammatory body responses. While immune granulomas are harbingers of systemic disease and a chronic inflammatory response can be part of a systemic disease, Dr. McCarty stated that he would not describe it as a harbinger of systemic disease if the inflammation is local. Further he stated that a local inflammatory response to a foreign body may, but does not have to, progress to a chronic inflammatory response. He also related several definitions of a granuloma from different authors, only one of which he felt was reasonable. Dr. McCarty testified that there were no granulomas in the records or tissue of Plaintiff and that the presence of a granuloma does not indicate illness. However, he testified that he did see two "clear" foreign body giant cells in slides from Plaintiff's explant.

[179] An inert substance does not react with the environment. Dr. Shons testified that plastic surgeons regarded silicone as being inert or having minimal tissue response. However, Dr. McCarty testified that he did not believe that silicone is completely inert, although he contended that silicone did not cause a biologic reaction when it was treated as a foreign body, ingested, and stored by

tissue of the host, and cause other processes to occur which are not part of normal biology or physiology and which will also alter the implant itself.[180]   Thus, the continued gel bleed from the silicone gel breast implant causes changes in the implant's elastomer shell and a continuous foreign body reaction both in the capsule forming around the breast implant, which can become hard, calcified, and distorted, and in the tissues where the silicone gel molecules migrate.

### 3.  Migration of Silicone Gel Molecules From Gel Bleed

There was contradictory testimony among the experts as to what happens after the molecules of the silicone gel have traveled through the elastomer shell to the outside of such shell implanted in tissue of the breast.   The issue between these experts was not whether migration of the molecules

---

macrophage cells.

[180] While Dr. Zeigler testified that fumed amorphous silica in the intermediates supplied by Dow Corning for the implant shell increased the tear strength of the shell and also were coated to make the surface of the shell hydrophobic, he elaborated that the fumed amorphous silica reduces permeation, concluding that silicone is stable in the body because of its exceptionally high bond strength and because silicone polymers have an unusually long service life in comparison with other polymers. However, this testimony appeared to be crafted to confuse the physical properties of the silicone implant components with the issue of gel bleed and its effect on the human body.   Dr. Zeigler, who is a gifted expert in the physical properties of silicone polymers, is not a medical doctor and does not appear to have qualifications to knowledgeably opine as to the effect of gel bleed on the human host.   Dr. Kotzin testified that he had seen no evidence that fumed amorphous silica in any appreciable amount gets into the system of women from the elastomer of a breast implant, and even if it did, there would be no lasting effects from a large amount of fumed amorphous silica.

86

occurs; instead the issue was how far such molecules migrate from the surface of the implant.[181]   The main points of contention between the experts for the Plaintiff and those for the Defendant were whether migration of the silicone molecules from gel bleed from the outside of the breast implant elastomer to other parts of the body occurred, and if so, what effect this migration has on the human host.

Several witnesses for Plaintiff explained the process of migration of the silicone molecules.   Some based their testimony on theory stemming from their knowledge of chemistry and the properties of the polymer; some based their testimony on study of tissues and examination of slides; and others based their opinions on study of scientific literature or their experience with patients in their respective medical practices.

Dr. Blais and Dr. Busch testified that the silicone gel, which began as a biologic material, ends as a chemical material in that the aqueous portion of the human body does not keep the gel bleed at the implant's outer shell.   Instead, Dr. Blais explained, the oil and impurities bleeding through the shell over time meet proteins, metals, and salts carried in watery portions of the body.   The proteins coat the particles of silicone oil like a soap, and the aqueous environment provides movement of the oil coated with protein

---

[181] As Dr. Solomon testified, "Everyone accepts that silicone is in the shell and is in the capsular tissue around the breast implant."

AO 72A
(Rev.8/82)

along the shell.  The globules detach and disperse in the fluid.  As the implant ages, the fluid becomes so rich with these substances that it becomes thick, like a toothpaste, and the vehicle of release allowing the silicone oil to disburse in the breast tissue.  This is a process which Dr. Blais called "emulsification".

Dr. Batich concurred that silicone gel is not an appropriate "fit" as a biomaterial for insertion into the human body in view of his research demonstrating migration of silicone gel droplets increasing over the surface area of the implant and degradation of the gel bleed through oxidation and hydrolysis.[182]  Dr. Busch described three probable pathways

---

[182] On this issue, Dr. Zeigler testified that silicone is not very soluble in water, being hydrophobic, or water-hating. He noted that body tissue is hydrophilic, or water-loving. However, he admitted on cross-examination that silicone is lipophilic or likes fat, and breast tissue is composed of fat. Further, the cell membranes of the body, which have lipids in them, are on balance hydrophilic because the body is mostly water.  Zeigler opined that to the extent contact between the scar capsule and the elastomer destroys the equilibrium of gel bleed, silicone will not necessarily be drawn to the lipophilic breast tissue due to its polymer structure because breast tissue is by its nature aqueous.  Thus, he theorized, the silicone will not disperse readily in an aqueous environment, and there would not be a tissue reaction with silicone since human tissue is aqueous to a large extent. However he acknowledged that silicone had been found in the lymph nodes of persons who had silicone gel breast implants and also reflected that from an article authored by Lynch in 1978 there is reason to believe that silicone could migrate from a rubber joint protheses via the marrow and lymphatics into the blood stream.  Plaintiff's Exhibit 3.218. He also stated that while silicones do not "react" strongly with water, which is what is meant by hydrophobic, they do "interact" with water, and if there are chemicals such as lye or sulfuric acid present, silicones will react with water.  He noted that the stability of silicones in water is why they are used in marine products.

However, Dr. Batich testified that he supervised a test on silicone elastomers which were immersed in water for a long time. The elastomers became hydrophilic, not hydrophobic, and no longer "beaded up". Dr. Batich concluded that there is degradation of silicone gel in the biologic condition due to oxidation and hydrolysis or reaction with water, both of which occur at the surface of the breast implant. Through the process of oxidation and hydrolysis, he opined, the oils from the gel bleed are converted back into silicone gel, and the particles from the gel bleed are broken down into smaller molecules, forming over a large surface an area of tiny droplets, some of which break off. Dr. Batich quantified this by stating a droplet with a radius of one centimeter can break into micron sizes, covering a surface area from a few centimeters to ten square meters in a process called emulsification. Since the interaction between the body and gel bleed occurs at the surface of the implant, he opined, one could expect more interaction than just that which occurs at the surface of the implant. However, he admitted that he did not know what happened beyond this in the human body. Dr. Batich testified that what happens to the small molecules that come out of the gel and how they react with other things in the human body has been little studied, and his own findings have not been published or peer reviewed although they are his conclusions reached through his direct observation of slides. He has engaged in research to try to answer where silicone migrates inside the body by conducting tests on rabbits. Dr. Batich found from his study that in the control rabbits which had no implants there was little silicon. In rabbits with silicone gel breast implants, there was significant silicone around the implant, and in rabbits with silicone gel breast implants with a cut in the elastomer, there were significant silicone levels in the brain of the rabbits. He measured the level of silicon, the element, by grounding up the brain, dissolving it in hydrofluoric acid, and testing it with a spectrometer. While silicon is necessary to life, and he assumed the control rabbits and the rabbits implanted with saline breast implants had some silicon in their bodies already, he testified that silicon in the rabbits naturally was at such a low level that it could not be measured, unlike the level of silicon which he found in the rabbits with ruptured silicone gel implants in his research study.

In contrast to this testimony of Dr. Batich based on his research, Dr. Shons testified, without elaborating on any underlying supporting evidence of testing, that silicone is hydrophobic, it will stick to itself and not to other things, and therefore it stays on the breast implant shell and scar tissue surrounding it.

Dr. McCarty testified that since the capsule is a fibrous membrane formed through the deposit of collagen, an extremely

AO 72A
(Rev.8/82)

for silicone migration within the human host: through the fascial planes, through the lymph system, and through the blood stream. Dr. McCarty also testified that there were three possible mechanisms for silicone migration away from the breast implant's surface: (1) gravity across tissue planes, (2) lymphatic transportation, and (3) vascular transportation.[183]

Dr. Busch's testimony was augmented by the testimony of Dr. Puszkin who has studied the effect of silicone on human tissue since 1992 and who also opined that the molecules from the silicone gel migrate away from the elastomer and cause

---

aqueous protein which gives form to the soft tissues and is a critical part of the connective tissues, the capsule contains or holds the particles of silicone fluid. However, Dr. McCarty noted that in examining slides of Plaintiff's tissues he did not see silicone in her tissue "appreciably" outside the capsule. He also acknowledged that silicone loves fat, or is lipophilic.

[183] However, Dr. McCarty testified that there is nothing to suggest that silicone can be distributed vascularly through the blood since silicone is hydrophobic, and the vascular system is pressurized. Therefore, he opined that not seeing silicone in the blood vessel is consistent with physiologic and physical fact. However, Dr. McCarty admitted that he had not dissected a blood vessel from the capsule of a woman who had a silicone gel breast implant.

Dr. McCarty discussed his review of Dow Corning documents in which a radioactive substance was tracked through the body to find the distribution of an injected fluid in 1972. The technique of radio labeled compounds with appropriate measurement and controls was in use in the 1960s. In the Dow Corning study, liquid silicone 360 was injected into rats which were killed at different times up to 90 days and their organs, urine, feces, and expired air examined to trace silicone distribution. Radioactive labeling was found in all, and the level of silicone was found to be above the background rate in many.

adverse immune responses.[184] Dr. Puszkin noted that the capsule which forms around the silicone gel breast implant is an inefficient and ineffective first barrier to further migration of the silicone molecules which have bled through the implant's shell.[185] With the use of magnification and laboratory slides he prepared from tissues taken from Plaintiff when her implants were removed, Dr. Puszkin identified silicone gel particles in the pseudo-capsule and also in the breast tissue located between the pseudo-capsule and Plaintiff's skin.[186] His testimony that silicone could also be seen in a blood vessel in one of the slides of

---

[184] Dr. Puszkin testified that he has examined over 2300 women with silicone breast implants during the last five years and performed microscopic analysis of the changes in their bodies in order to determine what happens to them with migration of silicone. He found that these women have a larger number of auto-antibodies, or antibodies which react against themselves, than women who have not been exposed to silicon, silicone gel, or silicone. He has amassed a data base using blood from women contributing to a blood bank compared to blood from women with silicone gel breast implants and has found in the latter antibodies to muscular, nerve, and connective tissue that cause inflammation, which initially is local but can be carried to the lymph nodes and in the blood and continually propagates. He has found that for many people these antibodies which the body creates do not have adverse symptoms. However, he examined samples of Plaintiff's blood and testified that she displayed an autoimmune reaction against her connective tissue.

[185] Dr. Puszkin opined that if silicone breaches the pseudo-capsule, it will be seen in the lymph nodes and in the blood vessels of the body, breaking into smaller and smaller particles which cannot be seen but can be measured. In contrast, Dr. McCarty testified that silicone from gel bleed does not move "freely" into and out of the capsule.

[186] Plaintiff's Exhibits 1.31(a-n) and 1.54 (a-d) prepared May 26, 1994.

Plaintiff's tissues was hotly disputed by Dr. McCarty.[187] Finally, Dr. Puszkin testified that Plaintiff's blood serum showed the presence of auto-antibodies, and the slides he prepared showed inflammation of a chronic nature, indicating an autoimmune reaction was occurring in Plaintiff's body. However, Dr. Puszkin did not look for migration of the silicone gel beyond the pseudo-capsule, blood vessels and capillaries, and tissue appearing on the slides he prepared, and he did not test for silicone in the lymph nodes of Plaintiff.[188]

Noting his disagreement on nearly every point to which Dr. Puszkin testified involving the issues in this case, Dr. McCarty stated that he had reviewed slides made from Plaintiff's explants and that there was no moderate, chronic inflammatory response to silicone in her breast capsule,[189] although silicone could be seen in a vacuole within a macrophage in the capsule. He emphatically stated that there

---

[187] Dr. McCarty's testimony on this dispute particularly emphasized Plaintiff's Exhibit 1.31(e). See also Plaintiff's Exhibit 1.31(f).

[188] But see footnote 43 supra. Dr. Puszkin testified that he saw no evidence of infection in Plaintiff.

[189] Dr. McCarty admitted that whether an inflammation is moderately chronic is a function of the number and type of cells seen by the pathologist. He also opined that generally an acute inflammatory reaction occurred close to the time of the insult, and generally it takes three to five days for an acute inflammatory reaction to be deemed to be chronic, although a local inflammatory response to a foreign body may, but does not have to, progress to a chronic inflammatory response.

92

was no evidence of silicone in a blood vessel shown on one of these slides as Dr. Puszkin had testified,[190] and the slides of Plaintiff's breast tissue showed no silicone in it. After explaining the process for preparing pathology slides and examining them by use of different lighting techniques,[191] Dr. McCarty was critical of Dr. Puszkin's use of magnification and lighting and Dr. Puszkin's conclusions. After categorically testifying that no silicone could be seen in a blood vessel on a slide of Plaintiff's breast tissue, Dr. McCarty opined that silicone does not travel into blood vessels "readily" because blood vessels are an aqueous media with a greater pressure gradient. He testified that he had never seen silicone in blood vessels of implanted women, citing several scholarly articles to support this statement. He then testified that women with silicone gel breast implants do not have increased silicone in their blood, but admitted that "[a]ll people have

_____

[190] Using Bright Field lighting, Dr. McCarty testified that the blood vessel shown on the slide of Plaintiff's tissue was perfectly normal, came from a healthy individual, and that there was no silicone in this blood vessel. Defendant's Exhibits 1261.14-19. He further testified that while the capsule tissue showed the presence of some silicone, the amount in the vacuoles shown on the slide was about one billionth of a gram.

[191] Three methods of lighting for microscopy which Dr. McCarty related are: (1) Bright Field by which light is transmitted directly through the slide from underneath it; (2) Nemarsky which uses wave length and polarized light resulting in incident light contrasts allowing the pathologist to see things which are not stained in three dimension; and (3) Dark Field in which an interference plate is placed so that light focuses on the edges of the material being examined, the beamed light from the sides allowing the sides of reflected objects which are not flat to be seen.

AO 72A
(Rev.8/82)

some silicone in their blood." Nevertheless, he adamantly testified that after examining the generous and significant breast biopsy tissue from Plaintiff on two slides, involving five fragments of breast tissue and showing a rich vascular, capillary, and blood vessel system and a rich lymphatic supply, no silicone whatsoever was found in that space. From this, Dr. McCarty concluded that there was no migration of silicone in Plaintiff's breasts.[192] While admitting that he found two, multi-nucleated giant cells in slides of Plaintiff, Dr. McCarty stated that giant cells are not limited to the

---

[192] Dr. McCarty noted there was no biopsy of Plaintiff's lymph nodes. He indicated that since the lymphatic channels are vascular and separate from the blood vessels, they are in the domain of homeostasis. Less than 1/10 of 1% of macrophages enter the lymph system and consume the silicone there, and he opined that macrophages with silicone will not travel through the lymph channels to the lymph nodes because of the gradient pressure. Dr. McCarty initially admitted that a lymph node with silicone would probably be enlarged. On recall to the witness stand, he stated that he was confused by defense counsel's question and that while silicone is not always found in the lymph nodes of women with silicone gel breast implants, and macrophages with silicone may but do not always travel to local lymph nodes, silicone will stay in the lymph node, and the lymph node does not necessarily become enlarged or inflamed. Later he testified that there are case reports where no trauma to the implant has been reported and silicone has been found in the abdomen and groin. He also acknowledged that his conclusion that there is no relationship between the presence of silicone and enlargement of lymph nodes was based on his pathology review of lymph nodes. Most of the lymph nodes he has received were enlarged and without silicone. However, most of the lymph nodes he has received do not come from women with silicone gel breast implants and are associated with other medical issues. He then stated that he could not tell for certain if there was silicone in Plaintiff's lymph nodes. He also ventured that if silicone is present and a lymph node is enlarged, an MRI or fine needle aspiration or excision biopsy and ultrasound could be used to determine if silicone is there or a marker could be employed.

presence of silicone, are not harmful, and do not cause damage.[193] From his observation of Plaintiff's tissue capsule, he found no local or systemic disease present, nothing to show that systemic disease would develop, and no cause for concern to her health. He concluded that Plaintiff's capsule was well matured with no active inflammation.[194]

Concurring with Dr. McCarty, Dr. Alan Shons testified that after reviewing the records of Dr. Worthing and the report of the pathologist after Plaintiff's explant, he found no evidence of silicone migration outside the breast capsule. However, Dr. Shons testified that from the hospital pathology report on Plaintiff's explant, a foreign body reaction could be discerned in the tissue surrounding the implant, which he described as dense, fibrous tissue containing foamy histiocytes which are part of the foreign body reaction. He further opined that since the silicone gel which has bled from the elastomer is hydrophobic and stays on the surface of the shell, in the fibrous capsule, and in the territory of the regional lymph nodes, such gel is not permeable to the scar

---

[193] Dr. McCarty noted that lymphocyte cells are part of the inflammatory reaction of the immune system. Dr. Williams explained that foreign body giant cells are caused by the merging of macrophages, frequently for the purpose to ingest particles.

[194] Dr. McCarty qualified this testimony on cross-examination by stating that he did not say that Plaintiff did not have systemic disease, but instead that he had testified that there are no changes or diseases in Plaintiff's breast that would indicate a risk for, or be associated with, any systemic disease.

capsule and does not migrate through the body.[195] However, this testimony was of a conclusory nature as Dr. Shons apparently has done no testing himself of the tissue to explain how he arrived at this opinion.[196] Further, without

---

[195] Dr. Shons testified that just as gel droplets are not permeable to the scar capsule and are encased in macrophasia, silicone gel that reaches the lymph nodes has the same reaction as in the scar capsule, that is a scar tissue barrier is formed which localizes the gel, encases and immobilizes it, and seals it off. However, Dr. Shons did not describe how the gel particles escaped from the scar tissue which he earlier testified acted as a barrier to gel migration. Further, he described the means by which the particles moved to the lymph nodes as being through lymphatic fluid in the lymphatic channels, a one-cell layer in the subcutaneous tissue just below the skin surface. Dr. McCarty also testified that silicone has been located in the axillary lymph nodes of implanted women, although he denied that there was any evidence in Plaintiff's medical records that she had silicone in her lymph nodes.

[196] Dr. Shons testified that he had agreed to be an expert witness for the Defendant because silicone gel breast implants are important to his specialty as a reconstructive plastic surgeon, particularly in the case of mastectomies, and that he felt women had been unnecessarily scared by publicity concerning breast implants. Other than his surgical work, Dr. Shons served as one of three plastic surgeons on an eight-member Scleroderma Task Force which met once in June of 1990. For this group, Dr. Shons conducted a survey in 1990 of plastic surgery literature on the relationship between connective tissue disease and silicone gel breast implants that consisted of approximately 94 articles. Of these, approximately 28 articles dealt with immune disease and breast implants. He then published an article about his review of this literature in the Annals of Plastic Surgery. Defendant's Exhibit 1251. Dr. Shons related five other cases involving silicone gel breast implants in which he has testified for the defendant breast manufacturer. Other than his professional work as a plastic surgeon involved primarily in breast reconstruction, a small percentage of breast augmentations, his survey of literature in the speciality of plastic surgery in 1990, and his examination of Plaintiff on October 13, 1997, Dr. Shons did not appear to have any direct experience in the testing or manufacturing of implants or the study of the effects of such implants on the human host. In fact, he testified that he was not a materials expert, that he had

AO 72A
(Rev.8/82)

elaboration, Dr. Shons testified that he had not seen silicone
migration except in the axillary lymph nodes in patients other
than Plaintiff.[197]

Although admitting that he had not tested silicone gel
and was relying only on his own reading of the literature, Dr.
Williams testified that in gel bleed, the molecules diffuse
through the elastomer, and the majority of molecules adhere to
the outside of the silicone shell because it is of similar
molecular composition.[198]  Some very small microscopic droplets
get into the capsule, and he would expect macrophages, which
would ingest the silicone droplet, to be present because this
occurs with other materials.  The macrophages with the
silicone droplets may move toward, and deposit the silicone
in, a lymph node, but to his knowledge macrophages do not go

---

implanted no silicone gel breast implants since 1993, and that
he had implanted only eight to ten saline implants in that
time.  He testified that his report filed in this case was
written and typed by someone at the office of counsel for
Defendant after he discussed it with counsel.  Defendant's
Exhibits 1154 & 1158.

[197] Although he denied that there was gel migration from
silicone gel breast implants, Dr. Shons admitted that if
silicone gel were injected directly into the breast, it would
diffuse throughout the breast, multiple scar tissue capsules
would form around the injected droplets, and lymphocytes and
macrophages would attack the gel.  While contending that the
elastomer was a safety factor to hold the silicone gel in
place, Dr. Shons agreed there would be a reaction in the body
to silicone gel which had not been contained in the elastomer
and scar tissue.

[198] Dr. Williams also testified that the first draft of
his Rule 25 expert witness disclosure was prepared by
attorneys for Defendants, although the substance of the report
was his.

into the bloodstream, and there is no deleterious effect on the lymph nodes or the patient. Although admitting that he had only read about and had not studied implants himself, he testified that molecular diffusion of silicone gel through the elastomer would result in the droplets staying on the hydrophobic, outside surface of the shell and eventually equilibrium, or cessation of gel bleed. While he could not recall one article discussing equilibrium being reached in a silicone gel breast implant device, Dr. Williams supported his opinion by stating, "It's a basic law of physics." Thus, Dr. Williams opined that from his reading on the subject, his study of body reaction, and his work with silicone elastomers, there is no harm to humans, whether local or systemic, from gel bleed or the long-term presence of silicone in the body.[199]

---

[199] Dr. Williams further supported this conclusion by saying that the silicone molecule is stable and does not interact chemically with its environment because the silicon-oxygen bond which forms its backbone is one of the strongest in terms of stability. Other polymers are not as strong because their backbones contain carbon which body chemicals or enzymes can cause to break down. In contrast, silicone polymers have the greatest resistance to attack by the body, and this stability applies to gel, fluid, and elastomer because all have the same silicon-oxygen backbone. Thus, while no material has no reactivity in the body, silicone and Teflon or gortex used in artificial arteries are materials of low reactivity. However, on cross-examination Dr. Williams admitted that macrophages, as part of the body's non-specific immune system, could ingest silicone droplets on the surface of the elastomer, and then a small number of them could travel away or stay there. While Dr. Williams testified that silicone gel and silicone elastomer are appropriate for use for breast implants and do not affect the immune system in humans, Dr. Williams has never tested a silicone gel breast implant in his laboratory, has never written an article on the biocompatibility of such implant, has never tested any long-term silicone gel-filled device intended for long-term

AO 72A
(Rev.8/82)

As to the issue of whether silicone migrates beyond the breast tissue, the experts also drew conflicting conclusions from the scholarly publication of Dr. Lencio Garrido.   Dr. Garrido published a report in which he related finding silicone from silicone gel breast implants in the tissues and blood and degradation of silicone products in the implanted human through the use of nuclear magnetic resonance ("NMR"). Dr. Zeigler, who since age sixteen has worked with NMR, referenced the work of Dr. Peter Macdonald who, he testified, tried without success to replicate the scientific work of Dr. Garrido.[200]   Dr. Zeigler testified that Dr. Macdonald found it would take centuries to obtain an observable signal showing

---

implant, has never seen a breast capsule or tested it, and has received no award for work with silicone gel, oil, or liquid. While familiar with gel bleed, Dr. Williams has never attempted to determine the rate of bleed.  He stated that his work is primarily with silicone elastomer which is generally safe for human implant as shown in rabbit tests for toxicity. Dr. Williams did agree that in some polymers, lower weight molecules are more toxic and have greater solubility than higher weight molecules.  He further admitted that he had not seen subchronic toxicity testing of components of the implant device by MEC, and that components may have different properties when tested separately than those properties manifested on tests when they were combined in the device.  In relying on literature to opine on MEC's breast implant product, Dr. Williams admitted that there were peer-reviewed articles concluding that silicone is not biocompatible and that silicone chronically causes problems when used in an implant.  However he testified that such articles were omitted from the list of articles on which he relied.

[200] Defendant's Exhibit 1293.  Dr. Zeigler testified that he is not an expert in silicone disease, disease causation, or immunology, has not examined tissue or blood of women or animals that have had silicone gel breast implants, and is not a veterinarian or a medical doctor.  He has not done NMR work on tissue or blood of women who had silicone gel breast implants.

99